Filing # 232976501 E-Filed 09/25/2025 03:29:59 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

EXHIBIT "A"

CASE NO.:

T.M., a minor child, by and through her
Next Friend and Attorney ad Litem,
AYELET FAERMAN, ESQ.,

Plaintiff,

v.

CHILDNET, INC.; PARTNERSHIP FOR COMMUNITY HEALTH, INC., D/B/A AVIDITY; LUTHERAN SERVICES FLORIDA, INC; THE CHILDREN'S PLACE AT HOME SAFE, INC., D/B/A HOMESAFE,

Defendants.
_______________________________/

## COMPLAINT

The Plaintiff, T.M., a minor child, by and through her Next Friend and Attorney ad Litem, AYELET FAERMAN, ESQ., by and through undersigned counsel, hereby sues Defendants, CHILDNET, INC.; PARTNERSHIP FOR COMMUNITY HEALTH, INC., D/B/A AVIDITY; LUTHERAN SERVICES FLORIDA, INC.; and THE CHILDREN'S PLACE AT HOME SAFE, INC., D/B/A HOMESAFE, and as grounds therefore states:

## INTRODUCTION

Shelters and group homes within Florida's child welfare system have been an open market for runaway behaviors, child-on-child sexual abuse, substance abuse, physical altercations, inadequate supervision, and incidents resulting in involvement with the Department for Juvenile


A Division of Kelley Kronenberg
10360 W. State Road 84 | Fort Lauderdale | Florida | 33324 | Tel. (754) 888-KIDS (5437) | Fax (954) 644-4848 | Toll Free 844-4KIDLAW
justiceforkids.com

Justice (hereinafter "DJJ") system for far too long. This case is a disturbing depiction of a pattern and practice of deliberate indifference to known risk to our most vulnerable children.

At just eleven (11) years old, T.M. entered the foster care system with a significant mental health history and a need for intensive services and supervision. What was a clear opportunity for the defendant child welfare agencies to protect, care for, and guide her was ignored, disregarded, and squandered. Predictably, without adequate care, supervision, structure, treatment, and security, T.M. was effectively left to fend for herself, engaging in dangerous behaviors leading to further victimization through run away episodes, child-on-child sexual abuse, substance abuse, arrests, commercial sexual exploitation and abuse resulting in substantial and long-lasting emotional and physical damage.

This Complaint details the Defendants' conduct which directly and proximately caused the harms T.M. has endured and will continue to endure.

## JURISDICTION AND VENUE

1. This action is for damages in excess of fifty thousand dollars ($50,000.00) excluding interest, costs, and attorney's fees, and, therefore, is within the jurisdiction of the Court.

2. The cause of action accrued in Broward and Palm Beach Counties, Florida.

3. Plaintiff has complied with any and all conditions precedent necessary for the maintenance of this lawsuit.

## PARTIES

4. At all times material hereto, T.M., who was born in 2012, was a minor child involved in the child welfare system who was in the physical custody of the Defendants in Broward and Palm Beach Counties, Florida.

5. Due to T.S.'s status as a minor child, this action is being brought by her Next Friend and Attorney ad Litem, AYELET FAERMAN, ESQ.

6. Due to the nature of the allegations as set forth herein below, T.M. is using a pseudonym as she was the victim of sexual abuse.

7. Defendant, CHILDNET, INC. (hereinafter "CHILDNET"), is a private non-governmental Florida Corporation operating its business in Broward and Palm Beach Counties, Florida, with its principal place of business in Broward County, Florida.

8. At all times material hereto, CHILDNET was the lead agency for community-based care in Broward and Palm Beach Counties, Florida, pursuant to § 409.986, et seq., Florida Statutes, and contracted with the Florida Department of Children and Families (hereinafter "DCF") as an independent contractor, under Contract Number JJ217 (Broward County) and Contract Number IJ706 (Palm Beach County), which are incorporated by reference as if fully set forth herein, to provide foster care and related services to children in Broward and Palm Beach Counties, including T.M. [1]

9. At all times material hereto, CHILDNET, as the lead agency for community-based care in Broward and Palm Beach Counties, Florida, was responsible for ensuring the health, welfare, and safety of all foster children within its system of care; providing an appropriate continuum of placements and services; ensuring safe and appropriate placement of foster children in Broward and Palm Beach Counties; providing case management services to children in Broward and Palm Beach Counties; and providing placement services to children in Broward and Palm Beach Counties, including T.M.

---

[1] Plaintiff has requested copies of CHILDNET's contract(s) with DCF from CHILDNET prior to filing this suit, but CHILDNET has not produced the contract(s).

10. At all times material hereto, CHILDNET was required to comply with applicable Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, CHILDNET Policies and Procedures,[2] CHILDNET's contracts with DCF, CHILDNET's contracts with its sub-contractors, and the common law to ensure the health, welfare, and safety of children in the custody of the State of Florida, including T.M.

11. Defendant, PARTNERSHIP FOR COMMUNITY HEALTH, INC., D/B/A AVIDITY (hereinafter "AVIDITY"), is a private non-governmental Florida Corporation operating its business in Broward County, Florida.

12. At all times material hereto, pursuant to § 409.986, et. seq., Florida Statutes, AVIDITY contracted with CHILDNET, as an independent contractor under Contract Number AVI23SHL, which is incorporated by reference as if fully set forth herein, to provide "Pre-placement/Emergency Respite" services to minor children in the legal and physical custody of the State of Florida, in Broward County, including T.M.[3]

13. At all times material hereto, AVIDITY owned and operated the "SAFE PLACE" shelter (hereinafter "AVIDITY SAFE PLACE"), located at 1100 West McNab Road, Fort Lauderdale, Florida, 33309, which was licensed to provide twenty-four (24) hours, seven (7) days a week "supervision and support" to ten (10) children aged 0-17 "who ha[d] been removed from foster homes, group homes or other shelter placements that [were] awaiting a more permanent placement."

14. At all times material hereto, AVIDITY was required to comply with applicable Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, CHILDNET

[2] Plaintiff has requested copies of CHILDNET's policies and procedures from CHILDNET prior to filing this suit, but CHILDNET has not produced any policies and procedures that were in effect at the time of this case.
[3] Plaintiff has requested copies of AVIDITY's contract(s) with CHILDNET from CHILDNET prior to filing this suit, but CHILDNET has not produced the contract(s).

Policies and Procedures, AVIDITY Policies and Procedures, AVIDITY's contracts with CHILDNET, and the common law to ensure the health, welfare, and safety of children in the custody of the State of Florida in Broward County, including T.M.

15. At all times material hereto, CHILDNET was required to monitor the performance of AVIDITY regarding the provision of "Pre-placement/Emergency Respite" services, and shelter services to ensure compliance with applicable Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, CHILDNET Policies and Procedures, and the common law, to ensure the health, welfare, and safety of children in the custody of the State of Florida, including T.M.

16. Defendant, LUTHERAN SERVICES FLORIDA, INC. (hereinafter "LSF"), is a private non-governmental Florida Corporation operating its business in Palm Beach County, Florida.

17. At all times material hereto, pursuant to § 409.986, et. seq., Florida Statutes, LSF contracted with CHILDNET, as an independent contractor under Contract Number LSF22SHL, which is incorporated by reference as if fully set forth herein, to provide "Pre-placement/Emergency Respite" services to minor children in the legal and physical custody of the State of Florida in Palm Beach County, including T.M.[4]

18. At all times material hereto, LSF owned and operated the "SAFE PLACE" shelter (hereinafter "LSF SAFE PLACE"), located at 4100 Okeechobee Boulevard, West Palm Beach, Florida, 33409, which was licensed to provide twenty-four (24) hours, seven (7) days a week "supervision and support" to ten (10) children aged 0-17 "who ha[d] been removed from foster homes, group homes or other shelter placements that [were] awaiting a more permanent placement."

[4] Plaintiff has requested copies of LSF's contract(s) with CHILDNET from CHILDNET prior to filing this suit, but CHILDNET has not produced the contract(s).



justice for kids

19. At all times material hereto, LSF was required to comply with applicable Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, CHILDNET Policies and Procedures, LSF Policies and Procedures,[5] LSF's contracts with CHILDNET, and the common law to ensure the health, welfare, and safety of children in the custody of the State of Florida, including T.M.

20. At all times material hereto, CHILDNET was required to monitor the performance of LSF regarding the provision of "Pre-placement/Emergency Respite" services, and shelter services to ensure compliance with applicable Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, CHILDNET Policies and Procedures, and the common law, to ensure the health, welfare, and safety of children in the custody of the State of Florida, including T.M.

21. Defendant, THE CHILDREN'S PLACE AT HOME SAFE, INC. d/b/a HOME SAFE (hereinafter "HOME SAFE"), is a private non-governmental Florida Corporation operating its business in Palm Beach County, Florida.

22. At all times material hereto, pursuant to § 409.986, et. seq., Florida Statutes, upon information and belief, HOME SAFE contracted with CHILDNET, as an independent contractor, to provide residential therapeutic group care services to minor children in the legal and physical custody of the State of Florida in Palm Beach County, including T.M.[6]

23. At all times material hereto, HOME SAFE owned and operated the "LIBRA HOUSE" therapeutic group home, located at 2480 Sixth Avenue South, Lake Worth, Florida, 33461, which was licensed to provide residential group care services to children aged 7-17 who had moderate to severe emotional diagnoses.

---

[5] Plaintiff has requested copies of LSF's policies and procedures from LSF prior to filing this suit, but LSF has not produced any policies and procedures.

[6] Plaintiff has requested copies of HOME SAFE's contract(s) with CHILDNET from HOME SAFE and CHILDNET prior to filing this suit, but neither have produced the contract(s).

24. At all times material hereto, HOME SAFE was required to comply with applicable Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, CHILDNET Policies and Procedures, HOME SAFE Policies and Procedures,[7] HOME SAFE's contracts with CHILDNET, and the common law to ensure the health, welfare, and safety of children in the custody of the State of Florida, including T.M.

25. At all times material hereto, CHILDNET was required to monitor the performance of HOME SAFE regarding the provision of therapeutic group care services to ensure compliance with applicable Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, CHILDNET Policies and Procedures, and the common law, to ensure the health, welfare, and safety of children in the custody of the State of Florida, including T.M.

26. At all times material hereto, CHILDNET, AVIDITY, LSF, and HOME SAFE were independent contractors and were not acting as officers, employees, or agents of the State of Florida for purposes of § 768.28, Florida Statutes.

## GENERAL ALLEGATIONS

27. On or about May 19, 2022, T.M. was removed from her biological parents in Broward County, Florida, and placed in the care and custody of the State of Florida due to allegations of household violence.

28. On or about May 19, 2022, T.M.'s case was assigned to CHILDNET to provide foster care and related services, including placement services and case management services.

29. At the time CHILDNET was assigned to T.M.'s case, CHILDNET knew that:

a. T.M. was nine (9) years old;

b. This was T.M.'s second time in out-of-home care in Florida;

---

[7] Plaintiff has requested copies of HOME SAFE's policies and procedures from HOME SAFE prior to filing this suit, but HOME SAFE has not produced any policies and procedures.



justice for kids

c. CHILDNET had previously provided foster care and related services to T.M. when T.M. was involved with the child welfare system in 2019 through 2020;

d. T.M. had a history of juvenile cataracts, glaucoma, had an artificial lens in her right eye, was blind in her right eye, and had poor vision in her left eye;

e. T.M. had previously been diagnosed with Adjustment Disorder, unspecified; Post-traumatic Stress Disorder ("PTSD"); Generalized Anxiety Disorder; and Other Specified Trauma and Stressor Related Disorder; and

f. T.M. had a history of low self-esteem, being bullied, temper tantrums, verbal aggression, physical aggression, suicidal ideations, homicidal ideations, visual hallucinations, self-injurious behaviors, eloping, Baker Acts, and was on psychotropic medication.

30. On or about May 19, 2022, T.M. was placed with her paternal aunt under CHILDNET's protective supervision.

31. On or about June 21, 2022, CHILDNET received a copy of T.M.'s Comprehensive Behavioral Health Assessment ("CBHA") and additionally knew that:

a. T.M. endorsed feelings of sadness, anxiety, stress, disrupted sleep, and an increased appetite;

b. T.M. had been suspended from school several times due to fighting and continued to be the victim of bullying;

c. T.M. was diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood by the assessor;

d. T.M. was Court Ordered to receive trauma-based counseling at the time of shelter but was not receiving them; and


justice for kids

e. T.M. was recommended to receive individual counseling.

32. The purpose of a CBHA was to, *inter alia*, provide recommendations for treatment and placement based upon professional judgment, and CHILDNET was required to comply with the recommendations of the CBHA.

33. Between June 21, 2022, and July 31, 2023, while T.M. was placed with her paternal aunt, CHILDNET additionally knew that:

a. T.M. was described as being anxious and nervous about many things, having excessive worry, and struggling with emotional control and impulsivity;

b. T.M. continued to exhibit low self-esteem, temper tantrums, verbal aggression, physical aggression, suicidal ideations, homicidal ideations, visual hallucinations, self-injurious behaviors, school suspensions due to her behavior, elopement; she now had auditory hallucinations; and she was still prescribed psychotropic medication;

c. T.M. was diagnosed with PTSD, chronic; Adjustment Disorder with Mixed Anxiety and Depressed Mood; Major Depressive Disorder with psychotic features; and Generalized Anxiety Disorder;

d. T.M. now had a 504 plan in school due to difficulties with her vision; and

e. A Child Placement Agreement – Care Precautions Plan was implemented for T.M. due to severe self-harm, suicidal ideations, hearing voices, and T.M. pulling her own hair.

34. On or about July 31, 2023, CHILDNET knew that T.M.'s paternal aunt requested that a new placement be considered for T.M. because she could no longer care for her; however,

upon information and belief, CHILDNET did not make any efforts to locate another placement for T.M.

35. On or about August 20, 2023, CHILDNET knew that T.M. was again hearing voices, T.M. overdosed on her psychotropic medication because she "wanted to make the voices stop," and T.M. was Baker Acted due to a suicide attempt.

36. CHILDNET knew that during T.M.'s Baker Act, she was diagnosed with Schizophrenia, Obsessive Compulsive Disorder, and rule out Schizoaffective Disorder, and her treating psychiatrist had also diagnosed her with Conduct Disorder.

37. On August 28, 2023, upon T.M.'s discharge from the Baker Act, CHILDNET placed T.M. back in the care of her paternal aunt despite the paternal aunt requesting alternative placement for T.M. nearly a month earlier.

38. On August 30, 2023, CHILDNET participated in a staffing and knew that there were recommendations for T.M. to be placed in a Residential Treatment Center (hereinafter "RTC") , also known as a Statewide Inpatient Psychiatric Placement (hereinafter "SIPP"), which was a secure placement; T.M. had not started trauma therapy yet, despite this having been Court Ordered nearly a year earlier; T.M. needed more intensive therapy to address her behavioral problems; and T.M. was also recommended to have an ABA assessment; however, CHILDNET did not immediately seek secure alternative placement for T.M. and CHILDNET did not immediately ensure that T.M. received the treatment and services she needed to keep her safe.

39. On or about September 11, 2023, CHILDNET knew that T.M. reported she was still hearing voices, she cut herself with glass so she "could feel pain," and she was observed with multiple lacerations on her arms; T.M. stated she did not feel safe by herself, she was a danger to herself, she was constantly looking around the room to see what potential items she could cut

herself with, and she reported she would hurt herself again; and T.M. was Baker Acted for the second (2nd) time in less than one (1) month due to suicide ideations and self-harm.

40. Between September 14, 2023, and September 19, 2023, while T.M. was still Baker Acted:

a. CHILDNET implemented another Child Placement Agreement – Care Precautions Plan for T.M., this time due to T.M. having physically assaultive behaviors that were a significant threat to others; severe self-harm of self-cutting; severe self-harm including two (2) Baker Acts, suicidal ideations, overdosing on medication, hearing voices, and T.M. pulling her own hair, and CHILDNET acknowledged that extra precautions were needed to supervise T.M. to ensure her safety;

b. CHILDNET knew that T.M.'s therapist felt T.M. needed "more intensive services" than she was able to provide and CHILDNET acknowledged that mental health therapy was a "priority" for T.M.;

c. T.M. self-harmed while she was Baker Acted resulting in the Baker Act getting extended;

d. CHILDNET acknowledged that T.M.'s caregiver/paternal aunt felt she was no longer able to meet T.M.'s needs, she did not feel she could keep T.M. safe, she again requested that CHILDNET find a new placement for T.M., and she felt that T.M. needed a "higher level of care;"

e. CHILDNET approved for T.M. to be placed in Specialized Therapeutic Foster Care (hereinafter "STFC") on a "crisis" level, it was recommended that T.M. be placed in STFC upon her discharge from the Baker Act, and CHILDNET acknowledged


justice for kids

that T.M. may need an even higher level of care than STFC to meet her serious mental health needs and her need for safety; and

f. CHILDNET stated that it did not "want [T.M.] to end up at SAFE PLACE" and T.M.'s Attorney ad Litem told CHILDNET that "SAFE PLACE cannot be an option for [T.M.]" due to her serious mental health needs and need for safety.

41. Prior to September 20, 2023, CHILDNET knew that at a minimum, T.M. required placement in STFC, and likely needed placement in a secure RTC/SIPP facility to meet her serious mental health needs and her need for safety.

42. However, CHILDNET was operating a system of care in "crisis," with systemic deficiencies, including a critical shortage of foster homes and STFC homes, lack of timeliness in locating placements, and overutilization of group care resulting in children needing placement in higher levels of care languishing in shelters for extended periods of time, where they were exposed to numerous harms.

43. On September 20, 2023, upon T.M.'s discharge from her nine (9) day Baker Act, instead of placing T.M. in STFC, instead of having T.M. evaluated for RTC/SIPP, and instead of placing T.M. in a traditional foster home with one to one supervision, CHILDNET contacted AVIDITY SAFE PLACE for placement of T.M. in its temporary shelter due to CHILDNET's ongoing failure to have sufficient placements to meet the needs of children it served.

**T.M.'s FIRST PLACEMENT AT AVIDITY SAFE PLACE**

44. Prior to September 20, 2023, both AVIDITY and CHILDNET knew that children placed at AVIDITY SAFE PLACE "may have experienced multiple placement failures and typically exhibit maladaptive behaviors that make placement difficult, such as running away, truancy and authority defiance."


justice for kids

45. Prior to September 20, 2023, both CHILDNET and AVIDITY knew that AVIDITY SAFE PLACE was not a secure facility and children placed there would come and go as they pleased, thereby exposing them to dangers on the streets including criminal involvement, drug use, prostitution, sexual activity, sex trafficking, and even death.

46. Prior to September 20, 2023, both CHILDNET and AVIDITY knew that many children placed at AVIDITY SAFE PLACE had histories of sexual abuse, child-on-child sexual abuse, and/or sexually reactive behaviors, which required AVIDITY and CHILDNET to implement child placement agreements to prevent further sexual abuse and child-on-child sexual abuse; however, CHILDNET and AVIDITY consistently failed to implement and/or follow child placement agreements for children placed at AVIDITY SAFE PLACE resulting in rampant child-on-child sexual abuse at AVIDITY SAFE PLACE and amongst children placed at AVIDITY SAFE PLACE while they were on runaway.

47. Prior to September 20, 2023, due to CHILDNET's placement crisis and critical shortage of available foster homes, CHILDNET had a widespread custom, policy, or practice of warehousing hard to place children, and children with sexual histories, substance abuse histories, and violent behaviors at AVIDITY SAFE PLACE, resulting in AVIDITY SAFE PLACE being a dangerous placement for vulnerable foster children, like T.M.

48. Between January 1, 2019 and September 19, 2023, CHILDNET and AVIDITY knew or should have known that law enforcement responded to AVIDITY SAFE PLACE[8] two thousand seven hundred forty-one (2,741) times, and among those responses:[9]

---

[8] Upon information and belief, CHILDNET's Broward SAFE PLACE shelter may have been operated by other agencies in the past; however, the shelter has always been for children served by CHILDNET and has always been co-located with CHILDNET.
[9] The below numbers do not include responses for assisting other agencies, information, or police service calls.

a. One thousand eight hundred sixty-five (1,865) were for children running away;[10]

b. One hundred twenty-eight (128) were for disturbances;

c. One hundred twenty (120) were for mentally ill persons, suicide threats, and/or medical issues;

d. Seventy-six (76) were for assaults, fights, and/or harassments;

e. Thirty-one (31) were for child abuse;

f. Twenty (20) were for suspicious incidents;

g. Eighteen (18) were for vandalism;

h. Three (3) were for narcotics conduct (however, upon information and belief, additional narcotic offenses are encompassed in other categories); and

i. Two (2) were for sexual assault and/or lewd and lascivious conduct (however, upon information and belief, additional sexual offenses are encompassed in other categories).

49. Upon information and belief, law enforcement responded to AVIDITY SAFE PLACE so often that there was a Fort Lauderdale Police Department detail officer assigned to the location at times.

50. As of September 20, 2023, CHILDNET and AVIDITY knew that AVIDITY SAFE PLACE could not meet T.M.'s serious emotional, behavioral, and mental health needs and immediate need for protection, that T.M. needed a higher level of care than the AVIDITY SAFE PLACE could provide, and that T.M. was at risk of running away, endangering herself, and being victimized by others, including other children placed at the shelter.

---

[10] Some of the one thousand eight hundred sixty-five (1,865) runaway reports were for children being recovered from runaway episodes.

51. Nevertheless, on September 20, 2023, CHILDNET placed eleven (11) year old T.M. at AVIDITY SAFE PLACE, and AVIDITY SAFE PLACE accepted eleven (11) year old T.M for placement, and as a result of this inappropriate placement, T.M.'s mental health continued to deteriorate, and she was exposed to numerous harms.

52. No later than September 20, 2023, AVIDITY knew or should have known that:

a. T.M. was eleven (11) years old;

b. This was T.M.'s second time in out-of-home care in Florida;

c. T.M.'s placement with her paternal aunt had recently broken down;

d. T.M. was approved for placement in STFC, was recommended to be placed in STFC, and was in the process of being assessed for placement in a RTC/SIPP;

e. T.M. had a history of juvenile cataracts, glaucoma, had an artificial lens in her right eye, and was blind in her right eye and had poor vision in her left eye;

f. T.M. had a 504 plan in school due to difficulties with her vision;

g. T.M. had a history of low self-esteem, being bullied, temper tantrums, verbal aggression, physical aggression, suicidal ideations, homicidal ideations, visual hallucinations, auditory hallucinations, self-injurious behaviors, elopement, and was on psychotropic medication;

h. T.M. had been Baker Acted twice in the last month for suicide attempts;

i. T.M. had been diagnosed with Adjustment Disorder, unspecified; Adjustment Disorder with Mixed Anxiety and Depressed Mood; Post-traumatic Stress Disorder ("PTSD"); Other Specified Trauma and Stressor Related Disorder; Generalized Anxiety Disorder; Major Depressive Disorder with psychotic features; Conduct

Disorder; Schizophrenia; Obsessive Compulsive Disorder; and rule out Schizoaffective Disorder;

j. T.M. was Court Ordered to receive trauma-based counseling at the time of shelter and was recommended to receive more intensive individual counseling;

k. T.M. had a Child Placement Agreement – Care Precautions Plan for T.M. due to her having physically assaultive behaviors that were a significant threat to others; severe self-harm of self-cutting; severe self-harm including two (2) Baker Acts, suicidal ideations, overdosing on medication, hearing voices, and T.M. pulling her own hair; and

l. T.M. had no prior history of sexual behaviors or child-on-child sexual abuse reports.

53. On September 22, 2023, less than two (2) days after T.M.'s placement at AVIDITY SAFE PLACE, T.M. ran away from AVIDITY SAFE PLACE for the first (1st) time, along with four (4) other foster children placed at AVIDITY SAFE PLACE.

54. Each time T.M. ran away, CHILDNET was required to interview T.M. within twenty-four (24) hours of her recovery to determine the primary factors that contributed to her run away, inquire into T.M.'s experience while absent from care, determine if T.M. was a possible victim of trafficking while on run away, and determine T.M.'s need for additional services and/or change in placement; however, CHILDNET consistently failed to appropriately assess T.M., failed to get T.M. additional services to address her serious mental health needs, failed to place T.M. in the level of care commensurate with her needs, and as result, T.M. deteriorated significantly and was repeatedly victimized in CHILDNET's system of care.

55. Later in the day on September 22, 2023, after returning from her first (1st) run away, T.M. ran away from AVIDITY SAFE PLACE for a second (2nd) time.

56. On September 25, 2023, T.M. ran away from AVIDITY SAFE PLACE for the third (3rd) time, this time with at least five (5) other foster children placed at AVIDITY SAFE PLACE who ranged in age from ten (10) to fifteen (15).

57. On September 27, 2023, T.M. disclosed to CHILDNET, and CHILDNET informed AVIDITY, that while T.M. was on her most recent runaway, she was the victim of child-on-child sexual abuse and was sexually abused/assaulted battered by some of the other foster children she was on runaway with.

58. No later than September 28, 2023, CHILDNET and AVIDITY knew that:

a. Two (2) abuse reports had been received regarding T.M. being the victim of child-on-child sexual abuse:

b. The six (6) foster children left AVIDITY SAFE PLACE at night and took a bus to the beach;

c. While they were at the beach, a thirteen (13) year old male older foster child (J.T.) told a ten (10) year old male foster child (I.W.) to kiss T.M., and when T.M. said no, J.T. and a fifteen (15) year old male foster child (Z.B.) held I.W. down on the ground, grabbed T.M. by the back of the head, forced I.W. and T.M. to kiss, and forced I.W. to touch T.M.'s butt;

d. Also while at the beach, J.T., who had a known prior history of child-on-child sexual abuse reports, grabbed T.M.'s breast, tried pulling down T.M.'s bathing suit, and touched T.M. on her buttocks; and


justice for kids

e. Law enforcement determined that T.M. and I.W. were forced to kiss each other by other children, T.M. was inappropriately touched against her will by more than one foster child, and T.M. was the victim of battery.

59. Also on September 28, 2023, T.M. had a Suitability Assessment to determine the level of placement she needed, AVIDITY told the assessor it was very concerned for T.M., including her elopement behaviors, emotional and behavioral instability, and not following rules at AVIDITY SAFE PLACE; CHILDNET told the assessor it could not identify a STFC home for T.M. due to the severity of T.M.'s mental health symptoms and lack of bed availability; the assessor determined that T.M. had emotional and behavioral disturbances serious enough to require therapeutic group home residential placement as her safety and well-being were at risk; and the assessor recommended that T.M. be placed in a therapeutic group home (hereinafter "TGH").

60. Nevertheless, CHILDNET and AVIDITY allowed T.M. to remain in this dangerous placement despite T.M.'s need for therapeutic placement, her deteriorating mental health, her increasingly dangerous behaviors since entering foster care, and her sexual victimization, and CHILDNET and AVIDITY failed to implement a Child Placement Agreement to protect T.M. from further harm.

61. On September 29, 2023, CHILDNET and AVIDITY knew that a third (3rd) abuse report was received alleging that there was a male placed at AVIDITY SAFE PLACE that had been sexually harassing T.M., inappropriately touching her, and violently throwing objects at her, and staff at AVIDITY SAFE PLACE were aware of the situation.

62. Between September 20, 2023, and September 29, 2023, while T.M. was placed at AVIDITY SAFE PLACE, law enforcement responded to AVIDITY SAFE PLACE fifty-nine (59) times, of which fifty-five (55) were for runaways,[11] and three (3) were for disturbances.

63. Between September 20, 2023 and September 29, 2023, CHILDNET and AVIDITY had knowledge of T.M.'s serious mental health needs, but failed to provide T.M. with the secure placement and services she required causing her mental health to significantly deteriorate and causing her to suffer further and permanent emotional, psychological and physical harm.

64. As of September 29, 2023, CHILDNET knew that at a minimum, T.M. required placement in STFC, she had been recommended for placement in a TGH, and she likely needed placement in a secure RTC/SIPP facility to meet her serious mental health needs and her need for safety.

65. On September 29, 2023, due to CHILDNET's ongoing failure to have sufficient placements to meet the needs of children it served, rather than placing T.M. in a STFC or TGH, and rather than placing T.M. in a traditional foster home with one to one supervision, CHILDNET contacted LSF SAFE PLACE because of "safety concerns" and asked for T.M. to be placed there because there was a child on child investigation between T.M. and four of the kids at AVIDITY SAFE PLACE, AVIDITY was stating that the kids were "plotting to jump" T.M. and they had "destroyed some of her belongings by putting ketchup and mustard on all her belongings and writing b[*]itch in paint on her things."

66. On September 29, 2023, T.M. was discharged from AVIDITY SAFE PLACE, because, according to AVIDITY, "[a] better and more suitable placement was found" for her.

---

[11] Some of the fifty-five (55) runaway reports were for children being recovered from runaway episodes.


justice for kids

## T.M.'s FIRST PLACEMENT AT LSF SAFE PLACE

67. Prior to September 29, 2023, both LSF and CHILDNET recognized that children placed at LSF SAFE PLACE "may have experienced multiple placement failures and typically exhibit maladaptive behaviors that make placement difficult, such as running away, truancy and authority defiance."

68. Prior to September 29, 2023, both CHILDNET and LSF knew that LSF SAFE PLACE was not a secure facility, and children placed there would come and go as they pleased, thereby exposing them to dangers on the streets including criminal involvement, drug use, prostitution, sexual activity, sex trafficking, and even death.

69. Prior to September 29, 2023, due to CHILDNET's placement crisis and critical shortage of available foster homes, CHILDNET had a widespread custom, policy, or practice of warehousing hard to place children and children with sexual histories, substance abuse histories, and violent behaviors at LSF SAFE PLACE, resulting in LSF SAFE PLACE being a dangerous placement for vulnerable foster children, like T.M.

70. Between January 1, 2019 and September 28, 2023, CHILDNET and LSF SAFE PLACE knew or should have known that law enforcement responded to LSF SAFE PLACE[12] one thousand twenty-one (1,021) times, and among those responses:[13]

a. Two hundred sixty-six (266) were for children running away;

b. One hundred sixty-one (161) were for runaways being recovered;

c. One hundred fifty (150) were for disturbances;

d. Fifty-eight (58) were for mentally disturbed persons and/or suicide attempts;

---

[12] Upon information and belief, CHILDNET's Palm Beach SAFE PLACE shelter may have been operated by other agencies in the past; however, the shelter has always been for children served by CHILDNET and has always been co-located with CHILDNET.

[13] The below numbers do not include responses for assisting other agencies, information, or police service calls.

e. Thirty-nine (39) were for assaults, fights, and/or threats;

f. Twenty-seven (27) were for child abuse;

g. Nine (9) were for vandalism; and

h. Nine (9) were for sexual assault, child molestations, lewd and lascivious conduct, and/or human trafficking (however, upon information and belief, additional sexual offenses are encompassed in other categories).

71. As of September 29, 2023, CHILDNET and LSF knew that LSF SAFE PLACE could not meet T.M.'s serious emotional, behavioral, and mental health needs and immediate need for protection, that T.M. needed a higher level of care than the LSF SAFE PLACE could provide, and that T.M. was at risk of running away, endangering herself, and being further victimized by other children placed at the shelter.

72. Nevertheless, on September 29, 2023, CHILDNET placed eleven (11) year old T.M. at LSF SAFE PLACE, and LSF SAFE PLACE accepted eleven (11) year old T.M for placement, and as a result of this inappropriate placement, T.M.'s mental health continued to deteriorate, and she was exposed to numerous harms.

73. No later than September 29, 2023, LSF knew or should have known that:

a. T.M. was eleven (11) years old;

b. This was T.M.'s second time in out-of-home care in Florida;

c. T.M.'s placement with her paternal aunt had recently broken down;

d. T.M. was approved for placement in STFC, was recommended for placement in a TGH, and likely needed placement in a RTC/SIPP;

e. T.M. had a history of juvenile cataracts, glaucoma, had an artificial lens in her right eye, and was blind in her right eye and had poor vision in her left eye;

f. T.M. had a 504 plan in school due to difficulties with her vision;

g. T.M. had a history of low self-esteem, being bullied, temper tantrums, verbal aggression, physical aggression, suicidal ideations, homicidal ideations, visual hallucinations, auditory hallucinations, self-injurious behaviors, elopement, and was on psychotropic medication;

h. T.M. had been Baker Acted twice since August 2023 for suicide attempts;

i. T.M. had been diagnosed with Adjustment Disorder, unspecified; Adjustment Disorder with Mixed Anxiety and Depressed Mood; Post-traumatic Stress Disorder ("PTSD"); Other Specified Trauma and Stressor Related Disorder; Generalized Anxiety Disorder; Major Depressive Disorder with psychotic features; Conduct Disorder; Schizophrenia; Obsessive Compulsive Disorder; and rule out Schizoaffective Disorder;

j. T.M. was Court Ordered to receive trauma-based counseling at the time of shelter and was recommended to receive more intensive individual counseling;

k. T.M. had run away from AVIDITY SAFE PLACE on multiple occasions and was the victim of child-on-child sexual abuse while placed at AVIDITY SAFE PLACE;

l. T.M. had a Child Placement Agreement – Care Precautions Plan for T.M. due to her having physically assaultive behaviors that were a significant threat to others; severe self-harm of self-cutting; severe self-harm including two (2) Baker Acts, suicidal ideations, overdosing on medication, hearing voices, and T.M. pulling her own hair; and

m. T.M. needed a Child Placement Agreement to protect her from further sexual victimization.

74. On October 1, 2023, within two (2) days of T.M.'s placement at LSF SAFE PLACE, CHILDNET and LSF SAFE PLACE knew that T.M. ran away from LSF SAFE PLACE for the first (1st) time, along with three (3) other foster children placed at LSF SAFE PLACE, ranging in age from thirteen (13) to seventeen (17); T.M. and the other foster children were located by law enforcement that day; T.M. was transported back to LSF SAFE PLACE; and within minutes of law enforcement leaving, T.M. and the seventeen (17) year old female foster child she had just run away with got into a verbal altercation that escalated into a physical altercation where T.M. was injured.

75. Between September 29, 2023, and October 2, 2023, while T.M. was placed at LSF SAFE PLACE, law enforcement responded to LSF SAFE PLACE eleven (11) times, and among those responses:

a. Two (2) were for runaways;

b. One (1) was for a runaway recovery;

c. Six (6) were for disturbances; and

d. One (1) was for a mentally disturbed person.

76. Between September 29, 2023, and October 2, 2023, CHILDNET and LSF had knowledge of T.M.'s serious mental health needs, but failed to provide T.M. with the secure placement and services she required causing her mental health to significantly deteriorate and causing her to suffer further and permanent emotional, psychological and physical harm.

77. On October 2, 2023, T.M. was discharged from LSF SAFE PLACE.[14]

[14] Plaintiff requested T.M.'s LSF SAFE PLACE file from LSF prior to filing this Complaint; however, LSF failed to produce T.M.'s shelter file.

**T.M.'s TEMPORARY PLACEMENT WITH HER PATERNAL AUNT**

78. On October 2, 2023, CHILDNET placed T.M. back with her paternal aunt temporarily until an appropriate and safe placement was able to be identified for T.M., and T.M.'s aunt requested one on one services while T.M. was to be placed with her to help supervise T.M.

79. On October 11, 2023, CHILDNET knew that T.M. got into a fight with another child at school, the child threw a cell phone at T.M.'s head, T.M. suffered a head injury, and T.M. was suspended from school for nine (9) days due to the fight.

80. As of October 16, 2023, CHILDNET knew that, at a minimum, T.M. required placement in STFC, she had been recommended for placement in a TGH, and she likely needed placement in a secure RTC/SIPP facility to meet her serious mental health needs and her need for safety.

81. On October 16, 2023, due to CHILDNET's ongoing failure to have sufficient placements to meet the needs of children it served, rather than placing T.M. in a STFC or TGH, and rather than placing T.M. in a traditional foster home with one to one supervision, CHILDNET once again contacted LSF SAFE PLACE for placement of T.M., asking if they took eleven (11) years olds, again advising that T.M. was a victim of child-on-child sexual abuse while placed at AVIDITY SAFE PLACE, and acknowledging that CHILDNET had "not found placement for [T.M.] and was hoping [LSF SAFE PLACE] can maybe assist [CHILDNET as CHILDNET was] trying to find an alternative placement for her."

**T.M.'s SECOND PLACEMENT AT LSF SAFE PLACE**

82. Prior to October 16, 2023, both CHILDNET and LSF still knew that LSF SAFE PLACE was not a secure facility and children placed there would come and go as they pleased,

thereby exposing them to dangers on the streets including criminal involvement, drug use, prostitution, sexual activity, sex trafficking, and even death.

83. Prior to October 16, 2023, due to CHILDNET's ongoing placement crisis and critical shortage of available STFC homes and TGH, CHILDNET still had a widespread custom, policy, or practice of warehousing hard to place children and children with sexual histories, substance abuse histories, and violent behaviors at LSF SAFE PLACE, resulting in LSF SAFE PLACE being a dangerous placement for vulnerable foster children, like T.M.

84. Between October 3, 2023, the day after T.M.'s last discharge from LSF SAFE PLACE, and October 15, 2023, the day before CHILDNET contacted LSF SAFE PLACE for placement of T.M. again, law enforcement responded to LSF SAFE PLACE eleven (11) times, and among those responses:

a. Four (4) were for disturbances;

b. Three (3) were for mentally disturbed persons; and

c. One (1) was for a fight.

85. As of October 16, 2023, CHILDNET and LSF knew that LSF SAFE PLACE still could not meet T.M.'s serious emotional, behavioral, and mental health needs and immediate need for protection, that T.M. needed a higher level of care than the LSF SAFE PLACE could provide, and that T.M. was at risk of running away, endangering herself, and being victimized by other children placed at the shelter.

86. Nevertheless, on October 16, 2023, CHILDNET placed T.M. at LSF SAFE PLACE, and LSF SAFE PLACE accepted eleven (11) year old T.M. for placement the second (2nd) time, and as a result of this inappropriate placement, T.M.'s mental health continued to deteriorate, and she was exposed to numerous harms.

87. On October 16, 2023, less than one (1) hour after T.M.'s second (2nd) placement at LSF SAFE PLACE, T.M. ran away for her second (2nd) runaway at LSF SAFE PLACE, and CHILDNET and LSF allowed T.M. to remain in this dangerous placement after she was recovered despite knowledge that LSF SAFE PLACE could not meet T.M.'s serious mental health needs, that LSF SAFE PLACE could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than LSF SAFE PLACE could provide.

88. On October 20, 2023, T.M. and another fourteen (14) year old female foster child ran away from LSF SAFE PLACE; this was T.M.'s third (3rd) runaway while placed at LSF SAFE PLACE; T.M. and the other girl took a bus to the girl's relative's home in Riviera Beach; they were subsequently located by law enforcement and taken back to LSF SAFE PLACE; and CHILDNET and LSF allowed T.M. to remain in this dangerous placement despite knowledge that LSF SAFE PLACE could not meet T.M.'s serious mental health needs, that LSF SAFE PLACE could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than LSF SAFE PLACE could provide.

89. On October 22, 2023, T.M. ran away from LSF SAFE PLACE for the fourth (4th) time; T.M. was located at a Dollar Tree after she was caught shoplifting; T.M. was transported back to LSF SAFE PLACE by law enforcement; and CHILDNET and LSF allowed T.M. to remain in this dangerous placement despite knowledge that LSF SAFE PLACE could not meet T.M.'s serious mental health needs, that LSF SAFE PLACE could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than LSF SAFE PLACE could provide.

90. On October 24, 2023, T.M. was Baker Acted due to auditory and visual hallucinations, thinking that there were spiders crawling on her body, and banging her head on the wall, and during this Baker Act, CHILDNET and LSF knew that:

a. T.M. had been without her psychotropic medication for several days prior to the Baker Act;

b. T.M. reported she had been using marijuana once per week and drinking alcohol twice per week for the last month;

c. T.M. reported she had been "'making poor choices' with her new peers that she has met at her group home;"

d. T.M. was diagnosed with Disruptive Mood Dysregulation Disorder; Major Depressive Disorder with psychotic features; Cannabis Use; and Panic Disorder;

e. T.M. disclosed inappropriate sexual contact with a female peer during the Baker Act, including the twelve (12) year old roommate doing "sexual things with her," T.M. reporting she did not want to do the sexual things and felt uncomfortable, but the roommate kept pressuring her so she engaged in oral sex and digital penetration with her roommate, the roommate had a prior history of sexual abuse and another open child-on-child sexual abuse case that was open, and the hospital was not told about T.M.'s recent sexual victimization so that safety precautions could be taken to prevent further child-on-child sexual abuse; and

f. T.M.'s disclosures led to another Abuse Report being received with T.M. as the victim of child-on-child sexual abuse.

91. On October 28, 2023, when T.M. was released from her Baker Act, CHILDNET placed T.M. at LSF SAFE PLACE, and LSF SAFE PLACE accepted T.M. for placement despite

knowledge that LSF SAFE PLACE could not meet T.M.'s serious mental health needs, that LSF SAFE PLACE could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than LSF SAFE PLACE could provide.

92. Also on October 28, 2023, another CBHA was completed for T.M., and CHILDNET and LSF further knew that:

a. T.M. gravitated to negative peer groups and continued to have poor self-esteem and self-worth;

b. T.M. tried marijuana and alcohol this year, and she also vaped for the first time;

c. T.M. had frequent school absences, would benefit from tutoring, and was still not enrolled in school since being placed in Palm Beach County;

d. T.M. was diagnosed with Major Depressive Disorder, recurrent, and Generalized Anxiety Disorder; and

e. It was recommended that if T.M. was unable to sustain in a group home setting, a higher therapeutic level of placement should be explored to meet her psychological needs.

93. CHILDNET was required to follow the recommendations of the CBHA, but failed to do so.

94. Between October 29, 2023, and November 6, 2023, CHILDNET and LSF knew that:

a. T.M. reported she can feel depressed for days, she was hyper at night, she only slept for four (4) hours at night, and she continued to use marijuana and alcohol;

b. T.M. was diagnosed with Alcohol Abuse, Cannabis Abuse, PTSD chronic, and Depressive Disorder, chronic;


justice for kids

c. Eleven (11) year old T.M. was treated at the hospital for nicotine withdrawal;

d. T.M. was involved in a fight with three (3) other female residents at LSF SAFE PLACE that started when a twelve (12) year old resident was teasing T.M. about her lazy eye, the verbal dispute escalated into physical violence, T.M. was stomped in the head by other LSF SAFE PLACE residents, and T.M. was treated at the hospital for blunt head trauma;

e. Law enforcement told CHILDNET that T.M. needed to leave LSF SAFE PLACE because law enforcement gets calls there all the time;

f. The Court determined that T.M. required placement in a TGH and ordered that she be placed in a TGH; and

g. After the Court ordered that T.M. be placed in a TGH, CHILDNET and LSF enrolled T.M. in a new school in Palm Beach County having determined that changing schools was in T.M.'s best interest because CHILDNET was unable to transport T.M. to her prior school in Broward County;

95. CHILDNET and LSF allowed T.M. to remain at LSF SAFE PLACE in violation of the Court's Order despite knowledge that LSF SAFE PLACE could not meet T.M.'s serious mental health needs, that LSF SAFE PLACE could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than LSF SAFE PLACE could provide.

96. On November 10, 2023, CHILDNET and LSF knew that:

a. T.M. was suspended from her new school for two (2) weeks for violently attacking another student;

b. T.M. and two other foster children aged thirteen (13) and fourteen (14) then ran away from LSF SAFE PLACE, this was T.M.'s fifth (5th) runaway from LSF SAFE

PLACE, the children were again located in Riviera Beach, and they were transported back to LSF SAFE PLACE by law enforcement;

c. Law enforcement responded to LSF SAFE PLACE two (2) more times that day because the children "were acting up;" and

d. T.M.'s mental health condition continued to deteriorate and her behaviors were escalating while placed at LSF SAFE PLACE, yet CHILDNET and LSF allowed T.M. to remain at this unsecure shelter where she was not safe and was not protected from harm.

97. On November 11, 2023, CHILDNET and LSF knew that:

a. T.M. and the same two foster children, aged thirteen (13) and fourteen (14), T.M. ran away with the day before, all ran away from LSF SAFE PLACE again for T.M.'s sixth (6th) runaway from LSF SAFE PLACE;

b. The children ran when law enforcement located them and tried to stop them;

c. When they were finally stopped T.M. and the other foster children all admitted to consuming alcohol and running away because they were fighting with staff at LSF SAFE PLACE;

d. T.M. and the other foster children were all found to be under the influence;

e. T.M. and the other foster children resisted law enforcement when they were being detained and T.M. struck an officer;

f. T.M. and the other foster children were all arrested, and

g. T.M., who had no prior involvement with DJJ, was charged with resisting arrest without violence at only eleven (11) years old.

98. Despite T.M.'s significant mental health deterioration, escalation in her behaviors, and her clear need for therapeutic placement which was now Court ordered, upon her release from DJJ custody, CHILDNET placed T.M. back at LSF SAFE PLACE, and LSF accepted T.M. back for placement knowing that LSF SAFE PLACE could not meet T.M.'s serious mental health needs or T.M.'s immediate need for protection and safety.

99. On November 12, 2023, CHILDNET and LSF knew that T.M. had made suicidal statements about hanging herself in her bedroom; T.M. then ran away from LSF SAFE PLACE for the seventh (7th) time; law enforcement found a string attached to a fire sprinkler in LSF SAFE PLACE that T.M. intended to hang herself with; when law enforcement located T.M. she was holding a piece of metal; and T.M. was Baker Acted again for the second (2nd) time in the three (3) weeks she had been placed back at LSF SAFE PLACE.

100. Between October 16, 2023, and November 16, 2023, while T.M. was placed at LSF SAFE PLACE the second (2nd) time, law enforcement responded to LSF SAFE PLACE thirty-eight (38) times, and among those responses:

a. Two (2) were for runaways;

b. Four (4) were for runaway recoveries;

c. Six (6) were for disturbances;

d. Six (6) were for mentally disturbed persons;

e. Two (2) were for assaults, fights, and/or threats; and

f. One (1) was for vandalism.

101. Between October 16, 2023, and November 16, 2023, CHILDNET and LSF had knowledge of T.M.'s serious mental health needs, but failed to provide T.M. with the secure

placement and services she required causing her mental health to significantly deteriorate and causing her to suffer further and permanent emotional, psychological and physical harm.

102. On November 16, 2023, T.M. was discharged from LSF SAFE PLACE.[15]

**T.M.'s PLACEMENT AT HOME SAFE LIBRA HOUSE**

103. On November 16, 2023, CHILDNET placed eleven (11) year old T.M. at HOME SAFE LIBRA HOUSE TGH upon T.M.'s discharge from her Baker Act, and HOME SAFE accepted T.M., even though HOME SAFE LIBRA HOUSE normally only accepted children twelve (12) and older.

104. Prior to November 16, 2023, CHILDNET and HOME SAFE knew that HOME SAFE LIBRA HOUSE was not a secure facility and children placed there would come and go as they pleased, thereby exposing them to dangers on the streets including criminal involvement, drug use, prostitution, sexual activity, sex trafficking, and even death.

105. Prior to November 16, 2023, CHILDNET had a widespread custom, policy, or practice of placing children with significant mental health histories, sexual histories, substance abuse histories, and violent behaviors at HOME SAFE LIBRA HOUSE, resulting in HOME SAFE LIBRA HOUSE being a dangerous placement for vulnerable foster children, like T.M.

106. Between January 1, 2019 and November 15, 2023, CHILDNET and HOME SAFE knew or should have known that law enforcement responded to HOME SAFE LIBRA HOUSE two hundred nineteen (219) times, and among those responses:[16]

a. Sixty-eight (68) were for runaways;

b. Five (5) were for children being recovered from runaway;

[15] Plaintiff requested T.M.'s LSF SAFE PLACE file from LSF prior to filing this Complaint; however, LSF failed to produce T.M.'s shelter file.
[16] The below numbers do not include responses for assisting other agencies, information, or police service calls.

c. Sixty-seven (67) were for mentally disturbed persons and/or suicide attempts;

d. Fourteen (14) were for assaults;

e. Six (6) were for disturbances;

f. Three (3) were for sexual assault and/or lewd and lascivious conduct (however, upon information and belief, additional sexual offenses are encompassed in other categories); and

g. Two (2) were for child abuse.

107. As of November 16, 2023, CHILDNET and HOME SAFE knew that HOME SAFE LIBRA HOUSE could not meet T.M.'s serious mental health needs, that HOME SAFE LIBRA HOUSE could not meet T.M.'s immediate need for protection and safety, that T.M. needed a higher level of care than HOME SAFE LIBRA HOUSE could provide, and that T.M. was at risk of running away, endangering herself, engaging in risky behaviors, engaging in behaviors that could lead to additional DJJ involvement, and of being further victimized.

108. No later than November 16, 2023, HOME SAFE knew or should have known that:

a. T.M. was eleven (11) years old;

b. This was T.M.'s second time in out-of-home care in Florida;

c. T.M. had a history of juvenile cataracts, glaucoma, had an artificial lens in her right eye, was blind in her right eye, and had poor vision in her left eye;

d. T.M. had a 504 plan in school due to difficulties with her vision;

e. T.M. had a history of low self-esteem, low self-worth, being bullied, gravitating to negative peer groups, temper tantrums, verbal aggression, physical aggression, suicidal ideations, homicidal ideations, visual hallucinations, auditory


justice for kids

hallucinations, self-injurious behaviors, elopement, marijuana use, alcohol use, vaping, nicotine use, school suspensions, and was on psychotropic medication;

f. T.M. had been Baker Acted four (4) times since August 2023, for suicide attempts and suicidal ideations;

g. T.M. had been diagnosed with Adjustment Disorder, unspecified; Adjustment Disorder with Mixed Anxiety and Depressed Mood; Post-traumatic Stress Disorder ("PTSD"), chronic; Other Specified Trauma and Stressor Related Disorder; Generalized Anxiety Disorder; Major Depressive Disorder with psychotic features; Conduct Disorder; Schizophrenia; Obsessive Compulsive Disorder; Disruptive Mood Dysregulation Disorder; Panic Disorder; Cannabis Abuse; Alcohol Abuse; and rule out Schizoaffective Disorder;

h. T.M. was Court Ordered to receive trauma-based counseling at the time of shelter and was recommended to receive more intensive individual counseling;

i. T.M. had run away from AVIDITY SAFE PLACE and LSF SAFE PLACE on multiple occasions;

j. T.M. had been arrested for resisting arrest without violence while in her last placement at LSF SAFE PLACE;

k. T.M. had been sexually victimized by multiple children since being placed in out-of-home care; and

l. T.M. had a Child Placement Agreement – Care Precautions Plan for Sexual Abuse – child-on-child investigation; and due to T.M. having physically assaultive behaviors that were a significant threat to others; severe self-harm of self-cutting;

severe self-harm including two (2) Baker Acts, suicidal ideations, overdosing on medication, hearing voices, and T.M. pulling her own hair.

109. On November 21, 2023, HOME SAFE diagnosed T.M. with Major Depressive Disorder, recurrent episode, with psychotic features, PTSD, and acknowledged that T.M. had early onset Psychosis.

110. Between November 29, 2023, and December 27, 2023, CHILDNET and HOME SAFE knew that:

a. T.M. physically appeared much older than her stated age of eleven (11);

b. T.M. reported a history of self-harm behaviors, including cutting when she is "numb;"

c. T.M. often felt as if her "stomach was empty" due to the psychotropic medication she was prescribed;

d. T.M. was suspended from school four (4) times, once for getting into a fight with a male student, once for refusing to go to class, once for leaving school property, and once for leaving internal school suspension and running away from school administrators;

e. T.M. attempted to steal a package from a residence after she and another HOME SAFE LIBRA HOUSE resident left school unauthorized;

f. T.M. got into three (3) physical altercations with peers at HOME SAFE LIBRA HOUSE;

g. T.M. had left HOME SAFE LIBRA HOUSE without permission multiple times;

h. T.M. was in a diversion program stemming from her arrest at LSF SAFE PLACE;

i. T.M. struggled to follow the rules of HOME SAFE LIBRA HOUSE and had been struggling to positively adjust to HOME SAFE LIBRA HOUSE; and

j. T.M. was still on the orientation level at HOME SAFE LIBRA HOUSE.

111. On December 27, 2023, T.M. ran away from HOME SAFE LIBRA HOUSE for the first (1st) time, was found walking on a busy road, was brought back to HOME SAFE LIBRA HOUSE by law enforcement, and CHILDNET and HOME SAFE allowed T.M. to remain in this dangerous placement after she was recovered despite knowledge that HOME SAFE LIBRA HOUSE could not meet T.M.'s serious mental health needs, that LSF SAFE PLACE could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than LSF SAFE PLACE could provide.

112. Between December 28, 2023, and January 30, 2024, CHILDNET and HOME SAFE knew that:

a. T.M. had a major infraction every week since being placed at HOME SAFE LIBRA HOUSE;

b. T.M. was presenting with concerning behaviors such as skipping school, school suspensions, smoking marijuana and nicotine at school, and physical aggression;

c. T.M. got into four (4) physical altercations with peers at HOME SAFE LIBRA HOUSE;

d. T.M. reported that her psychotropic medications were not controlling her symptoms;

e. T.M. was still struggling to follow the rules of HOME SAFE LIBRA HOUSE and to positively adjust to HOME SAFE LIBRA HOUSE;

f. T.M. was still on the orientation level at HOME SAFE LIBRA HOUSE; and


justice for kids

g. T.M. was now enrolled in alternative school, which was the third (3rd) school she had been in since September 2023.

113. Between February 5, 2024, and February 9, 2024, CHILDNET and HOME SAFE knew that T.M. was suspended from her new school for leaving campus with another resident of HOME SAFE LIBRA HOUSE without permission; T.M. got into a physical altercation with a peer at HOME SAFE LIBRA HOUSE resulting in T.M. requiring medical treatment for a human bite; and T.M. came back to HOME SAFE LIBRA HOUSE high on at least one occasion.

114. On February 9, 2024, CHILDNET and HOME SAFE knew that T.M. ran away from her specialized school, when T.M. was located she made suicidal statements and was observed with self-inflicted cuts on her arm and wrist, and T.M. was temporarily Baker Acted; however, when T.M. was released from the Baker Act that same day, CHILDNET placed T.M. back at HOME SAFE LIBRA HOUSE, and HOME SAFE LIBRA HOUSE accepted T.M. for placement despite knowledge that HOME SAFE LIBRA HOUSE could not meet T.M.'s serious mental health needs, that HOME SAFE LIBRA HOUSE could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than HOME SAFE LIBRA HOUSE could provide.

115. On February 23, 2024, CHILDNET was put on notice of "serious concerns" about T.M.'s placement at HOME SAFE LIBRA HOUSE, including T.M.'s frequent Baker Acts; HOME SAFE changing T.M.'s school, doing an updated psychiatric evaluation, and changing T.M.'s medication without telling anyone; and HOME SAFE failing to communicate with members of T.M.'s treatment team, including her Attorney ad Litem and her parents; HOME SAFE's conduct was described by members of T.M.'s treatment team as "outrageous;" and

CHILDNET was asked to "seriously" consider if this placement was in T.M.'s best interest and consider changing her placement.

116. CHILDNET agreed "with the issues [they were] having at LIBRA HOUSE;" however CHILDNET and HOME SAFE allowed T.M. to remain at HOME SAFE LIBRA HOUSE despite these serious concerns and despite knowledge that HOME SAFE LIBRA HOUSE could not meet T.M.'s serious mental health needs, that HOME SAFE LIBRA HOUSE could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than HOME SAFE LIBRA HOUSE could provide.

117. Between February 28, 2024, and April 17, 2023, CHILDNET and HOME SAFE knew that:

a. T.M. was engaging in unsafe behaviors/substance abuse/medication non-compliance, and general struggles with peers and staff at HOME SAFE LIBRA HOUSE;

b. Since her placement at HOME SAFE LIBRA HOUSE, T.M. had six (6) suspensions from school, was expelled from school, had ten (10) fights with peers, had five (5) elopements, had self-harmed several times, had allowed another peer to cut her wrist since, had been caught with contraband such as nicotine and marijuana, and was vaping and was found with a vape pen hidden in her vagina;

c. T.M. was reported to be very lethargic, overly medicated, was reporting side effects, including feeling shaky, from the medication HOME SAFE prescribed to her, and HOME SAFE had again prescribed psychotropic medication to T.M., this time to prevent weight gain, without consent, which was described as "outrageous" conduct;



justice for kids

d. T.M. would at times regurgitate her medication, which required increased supervision;

e. T.M. reported that "bad things happened during an elopement but did not want to talk about it;"

f. T.M. described her world as "chaotic" and reported she was feeling more emotional and her "moods had been switching more and fast;"

g. T.M. had very poor judgment and insight, and HOME SAFE was concerned about T.M.'s mental health and ability to make safe and sound decisions;

h. T.M.'s "mental and behavioral health [were] declining" at HOME SAFE LIBRA HOUSE, and there was "serious concern about [T.M.'s] overall well being if she remained at [the STGH] level of care;

i. T.M. was still on the orientation level at HOME SAFE LIBRA HOUSE; and

j. HOME SAFE recommended that T.M. be stepped up to a higher level of care so that she can receive the services needed, without the influence of temptation of elopements and substance use; and

k. A Suitability Assessment also recommended a step-up into the PRTC level of care and placement in a Psychiatric Residential Treatment Center due to T.M. having "significant difficulties at the current level of care," including "running away, fighting with peers, and drug use."

118. However, CHILDNET and HOME SAFE allowed T.M. to remain in this dangerous placement despite knowledge that T.M. was deteriorating, that HOME SAFE LIBRA HOUSE could not meet T.M.'s serious mental health needs, that HOME SAFE LIBRA HOUSE could not


justice for kids

meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than HOME SAFE LIBRA HOUSE could provide.

119. On April 19, 2024, CHILDNET and HOME SAFE knew that:

a. T.M. ran away from HOME SAFE LIBRA HOUSE after she got into a physical altercation with staff members who tried to restrain her;

b. T.M. was located by law enforcement and was brought back to HOME SAFE LIBRA HOUSE;

c. Shortly after T.M. was brought back to HOME SAFE LIBRA HOUSE, she locked herself in the bathroom and attempted to flood it with water, and HOME SAFE LIBRA HOUSE again restrained T.M.;

d. Law enforcement was called back to HOME SAFE LIBRA HOUSE because of T.M.'s behaviors, and while law enforcement was in the process of Baker Acting T.M., T.M. became combative with law enforcement, and another officer, who was in the process of Baker Acting another HOME SAFE LIBRA HOUSE resident, had to assist with T.M.; and

e. T.M. was arrested for this second (2nd) time, and was charged with resisting arrest with violence, at only eleven (11) years old.

120. Despite ongoing knowledge that T.M. was deteriorating at HOME SAFE LIBRA HOUSE, and HOME SAFE LIBRA HOUSE could not meet T.M.'s serious mental health needs or her immediate need for protection and safety, when T.M. was released from DJJ that same day, CHILDNET placed T.M. back at HOME SAFE LIBRA HOUSE, and HOME SAFE accepted T.M. for placement.

121. Between May 1, 2024, and May 6, 2024, CHILDNET and HOME SAFE knew that:


justice for kids

a. T.M. got into a physical altercation with a peer at HOME SAFE LIBRA HOUSE;

b. T.M. was enrolled back in public school and got into a fight on the bus almost immediately;

c. T.M. and a thirteen (13) year old peer from HOME SAFE LIBRA HOUSE ran away from school, the girls rode the bus all day, law enforcement eventually located them and they were brought back to HOME SAFE LIBRA HOUSE;

d. T.M. was suspended from school because she left grounds without permission;

e. T.M. was not showering and had been observed at school and at HOME SAFE LIBRA HOUSE with body odor;

f. There had been a decline in T.M.'s functioning since April 2024; and

g. HOME SAFE continued to recommend a higher level of care for T.M.

122. Despite ongoing knowledge that T.M. was deteriorating at HOME SAFE LIBRA HOUSE, and HOME SAFE LIBRA HOUSE could not meet T.M.'s serious mental health needs or her immediate need for protection and safety, CHILDNET and HOME SAFE allowed T.M. to remain at HOME SAFE LIBRA HOUSE.

123. On or about May 7, 2024, T.M.'s mental health had deteriorated so significantly and her behaviors had escalated to the point that she was arrested for three (3) counts of battery against HOME SAFE LIBRA HOUSE employees resulting in T.M. being immediately discharged from HOME SAFE LIBRA HOUSE.

124. Between November 16, 2023, and May 7, 2024, while T.M. was placed at HOME SAFE LIBRA HOUSE, law enforcement responded to HOME SAFE LIBRA HOUSE twenty (20) times, and among those responses:

a. Ten (10) were for mentally disturbed persons and/or suicide attempts;

b. Two (2) of which were for runaways;

c. Two (2) were for assaults and/or threats; and

d. One (1) was for a disturbance.

125. While placed at HOME SAFE LIBRA HOUSE, CHILDNET and HOME SAFE knew that TM. had seven (7) elopements, twelve (12) physical altercations, was suspended from school multiple times, was expelled from school, abused drugs and alcohol, was Baker Acted, was arrested twice, and was unsuccessfully discharged.

126. Between November 16, 2023, and May 7, 2024, CHILDNET and HOME SAFE had knowledge of T.M.'s serious mental health needs, but failed to provide T.M. with the secure placement and services she required causing her mental health to significantly deteriorate and causing her to suffer further and permanent emotional, psychological and physical harm.

**T.M.'s SECOND PLACEMENT AT AVIDITY SAFE PLACE**

127. As of May 7, 2024, CHILDNET knew that T.M. had significantly deteriorated since being in foster care, T.M. was Court ordered into a TGH level of care, and HOME SAFE and a Qualified Evaluator had recommended that T.M. be placed in a secure RTC/SIPP facility for her safety; however, upon learning that T.M. was arrested and being discharged from HOME SAFE LIBRA HOUSE, CHILDNET contacted AVIDITY SAFE PLACE for T.M. to be placed back at this shelter due to CHILDNET's ongoing placement crisis, lack of available STFC homes, lack of available TGH, and failure to request secure RTC/SIPP placement for T.M.

128. Prior to May 7, 2024, both AVIDITY and CHILDNET still acknowledged that children placed at AVIDITY SAFE PLACE "may have experienced multiple placement failures and typically exhibit maladaptive behaviors that make placement difficult, such as running away, truancy and authority defiance."

129. Prior to May 7, 2024, both CHILDNET and AVIDITY still knew that AVIDITY SAFE PLACE was not a secure facility and children placed there would come and go as they pleased, thereby exposing them to dangers on the streets including criminal involvement, drug use, prostitution, sexual activity, sex trafficking, and even death.

130. Prior to May 7, 2024, CHILDNET and AVIDITY still knew that many children placed at AVIDITY SAFE PLACE, including T.M., had histories of sexual abuse, child-on-child sexual abuse, and/or sexually reactive behaviors which required AVIDITY and CHILDNET to implement child placement agreements to prevent further sexual abuse and child-on-child sexual abuse; however, CHILDNET and AVIDITY consistently failed to implement and/or follow child placement agreements for children placed at AVIDITY SAFE PLACE, including for T.M., resulting in rampant child-on-child sexual abuse at AVIDITY SAFE PLACE and amongst children placed at AVIDITY SAFE PLACE while they were on runaway.

131. Prior to May 7, 2024, due to CHILDNET's ongoing placement crisis and critical shortage of available STFC homes and TGH, CHILDNET still had a widespread custom, policy, or practice of warehousing hard to place children and children with sexual histories, substance abuse histories, and violent behaviors at AVIDITY SAFE PLACE, resulting in AVIDITY SAFE PLACE being a dangerous placement for vulnerable foster children, like T.M.

132. Between September 30, 2023, the day after T.M.'s last discharge from AVIDITY SAFE PLACE, and May 6, 2024, the day before CHILDNET contacted AVIDITY SAFE PLACE for placement of T.M. again, law enforcement responded to AVIDITY SAFE PLACE four hundred eleven (411) times, and among those responses:

a. Two hundred thirty-nine (239) were for runaways;[17]

[17] Some of the two hundred thirty-nine (239) reports were for children being recovered from runaway episodes.


justice for kids

b. Twenty-five (25) were for mentally ill persons, suicide threats, and/or medical issues;

c. Twenty-four (24) were for disturbances;

d. Nine (9) were for assaults, fights, and/or harassments;

e. Eight (8) were for child abuse;

f. One (1) was for suspicious incidents; and

g. One (1) was for vandalism.

133. As of May 7, 2024, CHILDNET and AVIDITY knew that AVIDITY SAFE PLACE could not meet T.M.'s serious emotional, behavioral, and mental health needs and immediate need for protection, that T.M. needed a higher level of care than the AVIDITY SAFE PLACE could provide, and that T.M. was at risk of running away, endangering herself, and being further victimized.

134. Nevertheless, on May 7, 2024, upon T.M.'s release from DJJ, CHILDNET placed eleven (11) year old T.M. at AVIDITY SAFE PLACE, and AVIDITY SAFE PLACE accepted eleven (11) year old T.M for placement a second (2nd) time, in violation of the Court's Order, and as a result of this inappropriate placement, T.M.'s mental health continued to deteriorate, and she was exposed to numerous harms.

135. No later than May 7, 2024, AVIDITY knew or should have known that:

a. T.M. was still eleven (11) years old;

b. T.M. was Court ordered to be placed in a TGH;

c. T.M. was recommended for placement in a secure RTC/SIPP facility by her prior placement, which was a higher level of care than AVIDITY SAFE PLACE, and by a Qualified Evaluator;

d. T.M. had a history of low self-esteem, being bullied, temper tantrums, verbal aggression, physical aggression, suicidal ideations, homicidal ideations, visual hallucinations, auditory hallucinations, self-injurious behaviors, elopement, school suspensions, a school expulsion, and was on psychotropic medication;

e. T.M. had been Baker Acted five (5) times since August 2023 for suicide attempts, suicidal ideations, and visual and auditory hallucinations;

f. T.M. had been diagnosed with Adjustment Disorder, unspecified; Adjustment Disorder with Mixed Anxiety and Depressed Mood; Post-traumatic Stress Disorder ("PTSD"); Post-traumatic Stress Disorder ("PTSD"), chronic; Other Specified Trauma and Stressor Related Disorder; Generalized Anxiety Disorder; Major Depressive Disorder with psychotic features; Major Depressive Disorder, recurrent; Conduct Disorder; Schizophrenia; Obsessive Compulsive Disorder; rule out Schizoaffective Disorder; Disruptive Mood Dysregulation Disorder; Alcohol Abuse; Cannabis Use and Abuse; Panic Disorder; Depressive Disorder, chronic; and early onset Psychosis.

g. T.M. was Court Ordered to receive trauma-based counseling at the time of shelter and was recommended to receive more intensive individual counseling;

h. T.M. had run away from AVIDITY SAFE PLACE, LSF SAFE PLACE, and HOME SAFE LIBRA HOUSE on multiple occasions;

i. T.M. had been arrested three (3) times since her last placement at AVIDITY SAFE PLACE, including once for resisting arrest without violence, once for resisting arrest with violence, and most recently for three (3) counts of battery against HOME SAFE LIBRA HOUSE employees;

j. T.M. had completed diversion for her first DJJ case but had two (2) open DJJ cases;

k. T.M. was the victim of child-on-child sexual abuse while placed at AVIDITY SAFE PLACE and while Baker Acted; and

l. T.M. required a Child Placement Agreement – Care Precautions Plan for T.M. for Sexual Abuse – child-on-child investigation; and due to her having physically assaultive behaviors that were a significant threat to others; severe self-harm of self-cutting; severe self-harm including two (2) Baker Acts, suicidal ideations, overdosing on medication, hearing voices, and T.M. pulling her own hair.

136. On May 8, 2024, within one (1) day of T.M.'s second (2nd) placement at AVIDITY SAFE PLACE, CHILDNET and AVIDITY knew that T.M. ran away from AVIDITY SAFE PLACE; however, upon T.M.'s recovery from runaway, CHILDNET and AVIDITY allowed T.M. to remain in this dangerous placement despite knowledge that AVIDITY SAFE PLACE could not meet T.M.'s serious mental health needs, that AVIDITY SAFE PLACE could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than AVIDITY SAFE PLACE could provide.

137. Between May 9, 2024, and May 10, 2024, CHILDNET and AVIDITY knew that T.M. got into several physical altercations with other residents at AVIDITY SAFE PLACE, including a fight with another girl over a vape pen, a fight amongst all residents in the home, and all residents in the home causing a disturbance, which resulted in law enforcement responding to AVIDITY SAFE PLACE at least three (3) times; however, CHILDNET and AVIDITY allowed T.M. to remain in this dangerous placement despite knowledge that AVIDITY SAFE PLACE could not meet T.M.'s serious mental health needs, that AVIDITY SAFE PLACE could not meet

T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than AVIDITY SAFE PLACE could provide.

138. On May 13, 2024, CHILDNET and AVIDITY knew that an abuse report was received by the Abuse Hotline alleging that T.M. engaged in oral sex with a fourteen (14) year old boy in the CHILDNET/AVIDITY SAFE PLACE parking garage when she was first placed back at AVIDITY SAFE PLACE, and despite this knowledge, CHILDNET and AVIDITY failed to implement a Child Placement Agreement to protect T.M. from further sexual abuse victimization and they allowed T.M. to remain in this dangerous placement despite knowledge that AVIDITY SAFE PLACE could not meet T.M.'s serious mental health needs, that AVIDITY SAFE PLACE could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than AVIDITY SAFE PLACE could provide.

139. On May 14, 2024, CHILDNET and AVIDITY knew that T.M. refused to take her psychotropic medication and T.M. ran away from AVIDITY SAFE PLACE; however, upon T.M.'s recovery from runaway, CHILDNET and AVIDITY allowed T.M. to remain in this dangerous placement despite knowledge that AVIDITY SAFE PLACE could not meet T.M.'s serious mental health needs, that AVIDITY SAFE PLACE could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than AVIDITY SAFE PLACE could provide.

140. On May 15, 2024, T.M. disclosed to CHILDNET that she had unprotected sex with two (2) boys at AVIDITY SAFE PLACE at the same time, and this was reported to the Abuse Hotline the next day; however, CHILDNET and AVIDITY failed to implement a Child Placement Agreement to protect T.M. from further sexual abuse victimization, and they allowed T.M. to remain in this dangerous placement despite knowledge that AVIDITY SAFE PLACE could not


justice for kids

meet T.M.'s serious mental health needs, that AVIDITY SAFE PLACE could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than AVIDITY SAFE PLACE could provide.

141. Later that day on May 15, 2024, CHILDNET and AVIDITY knew that T.M. got into a physical altercation with a staff member at AVIDITY SAFE PLACE after T.M. asked for condoms, the staff member told T.M. to call her father, T.M. attempted to call her father and the staff member grabbed the phone from her and the two got into a physical altercation, T.M. attempted to walk away but the staff member provoked T.M., the staff member then hit T.M. with an electric fly swatter, T.M. then hit the staff member back, other AVIDITY SAFE PLACE staff members intervened to stop the fight, and the staff member then held a fire extinguisher and threatened other children at AVIDITY SAFE PLACE.

142. This incident was reported to law enforcement and to the Abuse Hotline several times and was closed with some indicators of physical injury because the AVIDITY SAFE PLACE staff member had a history of getting into verbal altercations with T.M., she provoked the incident instead of de-escalating it, and it was confirmed by witnesses that she hit T.M. with a fly swatter; however, CHILDNET and AVIDITY allowed T.M. to remain in this dangerous placement despite knowledge that AVIDITY SAFE PLACE could not meet T.M.'s serious mental health needs, that AVIDITY SAFE PLACE could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than AVIDITY SAFE PLACE could provide.

143. Between May 17, 2024, and May 21, 2024, CHILDNET and AVIDITY knew that:

a. T.M. ran away from AVIDITY SAFE PLACE at least four (4) times, usually with other children placed at AVIDITY SAFE PLACE and/or under CHILDNET's care, custody, and supervision;

b. T.M. had been smoking marijuana, drinking wine, eating edibles, vaping, running away, and refusing to take her medication during this placement at AVIDITY SAFE PLACE;

c. T.M. was constantly trying to get vape and alcohol while placed at AVIDITY SAFE PLACE, including by going to the smoke shop down the street and asking adults to get substances for her;

d. T.M. was hiding contraband in the dumpster outside of CHILDNET and AVIDITY SAFE PLACE, which were co-located in the same building;

e. T.M. was seen inappropriately dressed and "all beat up" from being jumped by two (2) other children at CHILDNET/AVIDITY SAFE PLACE's building;

f. T.M.'s grades had been declining while in out-of-home care because she "started focusing more on smoking and skipping class;" and

g. T.M. was still not enrolled in school two (2) weeks after her placement.

144. On May 21, 2024, CHILDNET and AVIDITY knew that another abuse report was received by the Abuse Hotline alleging that T.M. had run away with two (2) fourteen (14) year old boys on May 20, 2024, who were placed in another AVIDITY placement but came to AVIDITY SAFE PLACE "to visit" T.M., the two boys involved were also involved in T.M.'s first child on child sexual abuse incident at AVIDITY SAFE PLACE, and one of the boys had a video of T.M. performing oral sex on the other boy, and the video of the sex act had been posted on social media making T.M. a victim of sexual exploitation; however, CHILDNET and AVIDITY failed to implement a Child Placement Agreement to protect T.M. from further sexual abuse victimization, and they allowed T.M. to remain in this dangerous placement despite knowledge that AVIDITY SAFE PLACE could not meet T.M.'s serious mental health needs, that AVIDITY SAFE PLACE

could not meet T.M.'s immediate need for protection and safety, and that T.M. needed a higher level of care than AVIDITY SAFE PLACE could provide.

145. On May 22, 2024, a hearing took place where the Court was informed of the four (4) abuse reports that had been received regarding T.M. since her second (2nd) placement at AVIDITY SAFE PLACE, and during the hearing:

a. CHILDNET testified that:

i. T.M. had been displaying behavioral concerns since she had been placed at AVIDITY SAFE PLACE;

ii. T.M. was constantly running away from AVIDITY SAFE PLACE because it was not a secure facility;

iii. AVIDITY SAFE PLACE was an emergency placement and intake shelter that was not meant to serve as a long term placement for children;

iv. T.M. was eating edibles, drinking wine, vaping, and walking up to different cars while on runaway asking for money to buy drugs, vape, and alcohol;

v. T.M. was refusing to take her psychotropic medication;

vi. T.M. told CHILDNET she had oral sex with one boy, she had sex with two boys, and T.M. was only eleven (11) and confused about what happened;

vii. T.M. got jumped by two (2) to three (3) individuals who used to be placed at AVIDITY SAFE PLACE when they came back to the shelter to fight T.M.;

viii. T.M. got into a fight with a staff member at AVIDITY SAFE PLACE, AVIDITY looked at the cameras and saw that the staff member put her hands on T.M., and the staff member was suspended;

ix. CHILDNET thought it was the "crowd" at AVIDITY SAFE PLACE that was the problem;

x. Since the end of April 2024, T.M. had been rapidly deteriorating, and she did not want to be at AVIDITY SAFE PLACE; and

xi. CHILDNET had only sent one (1) email to look for placement for T.M. since she was placed at AVIDITY SAFE PLACE on May 7, 2024;

b. Judge Alberto Ribas:

i. Found that AVIDITY SAFE PLACE was not safe for T.M., and he did not want her placed there;

ii. Found that CHILDNET's failure to protect T.M. from harm while placed at AVIDITY SAFE PLACE was "egregious," "atrocious," and "not a one off;"

iii. Found that there were "multiple incidents of this child suffering trauma and abuse in [CHILDNET'S] care;"

iv. Questioned why CHILDNET did not put a one to one in place on its own prior to the hearing;

v. Found that he had previously ordered that T.M. be placed in a TGH, she needed to be in a secure RTC/SIPP facility, but instead she was at a shelter, which was not the level of care he ordered, and there were no efforts to get her placed in a TGH since her discharge from HOME SAFE LIBRA HOUSE;

vi. Found that there was lack of reasonable efforts by CHILDNET to find a safe placement for T.M.;

vii. Ruled that AVIDITY SAFE PLACE was not an appropriate placement for T.M.;

viii. Ordered that CHILDNET was to find an appropriate placement for T.M.;

ix. Ordered that if T.M. was to remain at AVIDITY SAFE PLACE, which he did not think would happen based on his rulings, T.M. needed to have a one to one supervising her twenty-four hours a day seven days a week;

x. Ordered that CHILDNET status the parties and the Court within five (5) days regarding getting T.M. seen by an OBGYN and whether any of the boys who engaged in sex acts with T.M. were still residing at AVIDITY SAFE PLACE, and if so, what was the plan to keep T.M. safe and protected from harm;

xi. Ordered that T.M. was to be seen by the Nancy J. Cotterman Center for a sexual assault exam within fourteen (14) days;

xii. Ordered that CHILDNET status the parties and the Court within thirty (30) days regarding the status of all abuse reports and their findings and any referrals made to the state attorney's office for criminal charges stemming from the abuse reports; and

xiii. Ordered that T.M. be placed in a secure RTC/SIPP facility.

146. On May 22, 2024, after the hearing where the Judge admonished CHILDNET and ordered that T.M. be placed in a secure RTC/SIPP facility, T.M. was dropped off at school for her first (1st) day back since being placed in Broward County wearing a bonnet and dirty clothes that were inappropriate including short shorts; T.M. jumped the fence at school and ran away; when

T.M. was located by law enforcement she stated that she was going to continue to run away; T.M. was observed to be "having some sort of mental breakdown;" and T.M. was Baker Acted.

147. Between May 22, 2024, and May 28, 2024, CHILDNET and AVIDITY knew that:

a. T.M. was having huge issues with hygiene, would leave pads and wrappers on the floor in her bedroom, and she did not shower daily;

b. T.M. admitted she struggled in daily life, she was irritable most of the time, and she had issues regulating her mood;

c. T.M. reported hearing voices again intermittently asking her to do bad things like fight or run away;

d. T.M. was engaged in inappropriate behavior with minors, sexual activity, and was still drinking alcohol, vaping, and using cannabis;

e. One (1) of the boys T.M. had sex with was still placed at AVIDITY SAFE PLACE;

f. T.M. was being bullied by peers;

g. T.M. got into a fight with another patient during her Baker Act;

h. T.M. was not in the correct academic setting, and efforts needed to be made to get her into the correct school;

i. T.M. reported she did not want to be at AVIDITY SAFE PLACE and would continue to run away if placed back there;

j. T.M. was in need of glasses; and

k. CHILDNET did not participate in a discharge staffing with the hospital prior to T.M.'s release from her Baker Act.

148. On May 28, 2024, upon T.M.'s discharge from the most recent Baker Act, due to CHILDNET's ongoing failure to have sufficient placements to meet the needs of children it served,

rather than placing T.M. in a RTC/SIPP facility, TGH, or STFC, and rather than placing T.M. in a traditional foster home with one to one supervision, CHILDNET placed T.M. back at AVIDITY SAFE PLACE, and AVIDITY SAFE PLACE accepted T.M. for placement despite ongoing knowledge and the Court's express findings that AVIDITY SAFE PLACE was not an appropriate placement for T.M. and was not a safe placement for T.M.

149. Between May 28, 2024, and May 31, 2024, CHILDNET and AVIDITY knew that:

a. Despite the Court Ordering CHILDNET to have a one to one assigned to T.M. twenty-four (24) seven (7) if she was placed at AVIDITY SAFE PLACE, the one to one CHILDNET hired was only at AVIDITY SAFE PLACE between eight (8) to twelve (12) hours a day;

b. The one to one fell asleep at least once while they were supposed to be watching T.M.;

c. T.M. refused to go to school, ran away from AVIDITY SAFE PLACE to meet an unknown male she had met at the vape store the first time she was placed at AVIDITY SAFE PLACE, and when asked where the one to one was when T.M. ran away, CHILDNET advised they were not required to leave AVIDITY SAFE PLACE to follow her and would not "cover her going all over town if she refuse[d] to comply;" and

d. A Motion for Civil Contempt/Enforcement was filed against CHILDNET because CHILDNET violated the Court's Order with respect to placement and one to one supervision of T.M., and CHILDNET's "continued failure to comply with the court's order puts [T.M.] at imminent risk of abuse, neglect, or abandonment affecting her health, safety, and welfare."


justice for kids

150. On May 31, 2024, an emergency hearing was held where T.M. was ordered to be immediately placed with her father under normalcy with stabilization services.

151. Between May 7, 2024, and May 31, 2024, while T.M. was placed at AVIDITY SAFE PLACE, law enforcement responded to AVIDITY SAFE PLACE fifty-nine (59) times, and among those responses:

a. Thirty (30) were for runaways;[18]

b. Eleven (11) were for disturbances;

c. Four (4) were for mentally ill persons, suicide threats, and/or medical issues;

d. Four (4) were for assaults, fights, and/or harassments; and

e. One (1) was for a suspicious incident;

152. On May 31, 2024, T.M. was discharged from AVIDITY SAFE PLACE for the second time, AVIDITY acknowledged that T.M. "struggled with fitting in with her peers," "often eloped and put herself in high-risk situations," and T.M. "did not receive any services while at SAFE PLACE."

153. On July 31, 2024, T.M. was officially reunified with her parents.

154. On February 10, 2025, protective supervision was terminated, and CHILDNET closed its case.

155. Between September 20, 2023, and May 31, 2024, T.M. was never placed in a foster home, and was instead warehoused in two different "pre-placement/respite" shelters and a "therapeutic" group home, and during those eight (8) months in CHILDNET's foster care system, T.M. was repeatedly a victim of child-on-child sexual abuse, sexual assault and/or sexual battery, sexual exploitation, physical abuse, emotional abuse, neglect, mental health deterioration,

[18] Some of the thirty (30) reports were for children being recovered from runaway episodes.


justice for kids

escalation in behaviors resulting in three (3) arrests, school suspensions and expulsions, substance abuse, sexual reactivity, and T.M.'s increased vulnerabilities from repeated traumas in out-of-home care have resulted in her becoming a victim of sex trafficking.

**<u>COUNT I - NEGLIGENCE CLAIM AGAINST DEFENDANT CHILDNET, INC.</u>**

156. Plaintiff realleges paragraphs 1-155 as if fully set forth herein.

157. Defendant, CHILDNET, as the lead community-based agency contracted to provide child welfare services in Broward and Palm Beach Counties, owed T.M. the following statutory, contractual, and common law duties:

a. To ensure T.M.'s health, safety and well-being while under its care, custody, and supervision;

b. To protect T.M. from sexual abuse, child-on-child sexual abuse, physical abuse, emotional abuse, neglect, victimization, and further harm;

c. To provide a safe, secure environment where T.M. was free from unreasonable risk of harm;

d. To use reasonable care in the placement, oversight and supervision of T.M.;

e. To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, DCF's Operating Procedures, CHILDNET's Policies and Procedures, CHILDNET's contract(s) with DCF, and CHILDNET's contract(s) with its subcontractors, including AVIDITY, LSF, and HOME SAFE, regarding the health, welfare, and safety of T.M.;

f. To have available an appropriate continuum of placements, including specialized therapeutic foster homes, therapeutic group homes, and secure residential treatment centers for foster children in its system of care, including T.M.;

g. To search for specialized therapeutic foster homes out of county when such placements do not exist within CHILDNET's system of care;

h. To investigate the fitness of any proposed placement for T.M., taking into account her individualized physical, emotional, behavioral, and social needs;

i. To ensure that each placement T.M. was in was in her best interest pursuant to, and including, but not limited to, F.S. 39.4021, F.S. 39.4022, F.S. 39.4023, F.S. 39.01375, F.A.C. 65C-28.024, F.A.C. 65C-30.011, F.A.C. 65C-29.007, DCF Operating Procedure 170-11, and CHILDNET Policies CN003.038, CN003.051, CN015.017;

j. To ensure that all available information was provided to all shelters, group homes, and caregivers regarding the foster children placed therein, including whether the child had a history of sexual abuse, sexual acting out, sexual aggression, violence, and/or substance abuse to enable caregivers to implement all precautionary measures necessary and required to keep all foster children in that placement safe in the placement and outside of that placement, including T.M., pursuant to, and including, but not limited to, F.S. 39.4021, F.S. 39.4022, F.S. 39.4023, F.S. 39.01375, F.A.C. 65C-28.024, F.A.C. 65C-30.011, F.A.C. 65C-29.007, DCF Operating Procedure 170-11, and CHILDNET Policies CN003.038, CN003.051, CN015.017;

k. To continually assess the adequacy and safety of T.M.'s placements;

l. To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all foster children, including T.M., were safe, appropriately cared for, and adequately supervised;

m. To ensure safety plans, child placement agreements, and any other necessary safety measures were implemented to ensure T.M. would not engage in self-harm, child-on-child sexual abuse, and prevent sexually reactive behaviors pursuant to, and including, but not limited to, F.A.C. 65C-30.011, F.A.C. 65C-29.007, DCF Operating Procedure 170-11, and CHILDNET Policies CN003.038, CN003.051, CN015.017;

n. To have available an appropriate continuum of services to address T.M.'s mental health and behavioral needs;

o. To ensure all necessary and appropriate assessments and evaluations for T.M. were completed in a timely manner, including, but not limited to, Suitability Assessments, psychological evaluations, psychiatric evaluations, psychosexual evaluations, behavioral assessments, and substance abuse assessments;

p. To ensure that all recommendations from assessors, evaluators, and other professionals regarding T.M. were followed and implemented in a timely manner;

q. To ensure T.M. consistently received necessary and recommended therapeutic services, behavioral services, and educational services in a timely manner;

r. To ensure all Court Orders regarding placement, services, supervision, and monitoring of T.M. were complied with;

s. To ensure that all reasonable suspicion of abuse, including child-on-child sexual abuse, and neglect was reported to the Abuse Hotline;

t. To properly report, investigate and take action on incidents of children in the custody and care of the State of Florida, including T.M., eloping and running away from its physical custody and/or their placements pursuant to, and including, but not limited to, F.S. 39.0141, F.A.C. 65C-30.019, DCF Operating Procedure 170-03, and CHILDNET Policy CN013.008;

u. To implement reasonable safeguards to prevent children in the custody of the State of Florida, including T.M., from eloping and running away, to immediately report all children known to be missing, including T.M., to law enforcement, the Court, and DCF, among others, and to take all reasonable and necessary steps and action to take such children back into physical custody and place them in a safe, secure placement pursuant to, and including, but not limited to, F.S. 39.0141, F.A.C. 65C-30.019, DCF Operating Procedure 170-03, and CHILDNET Policy CN013.008;

v. To ensure that T.M. was assessed, referred for appropriate services, and placed in a safe placement each and every time she returned from runaway status pursuant to, and including, but not limited to, F.A.C. 65C-30.019, DCF Operating Procedure 170-03, and CHILDNET Policy CN013.008;

w. To ensure appropriate oversight of subcontracted agencies, including AVIDITY, LSF, and HOME SAFE; and

x. To continually monitor the performance of subcontracted agencies, including AVIDITY, LSF, and HOME SAFE, to ensure they were meeting children's needs for services and safety and to ensure their compliance with Florida Statutes, Florida Administrative Code, DCF Operating Procedures, and CHILDNET policies and procedures; and

y. To not put children in dangerous shelters and group homes when they need a higher level of care.

158. Defendant, CHILDNET breached said duties.

159. As a direct result and proximate cause of the aforementioned breaches, T.M. suffered emotional harm; deteriorating mental health; sexual abuse/assault; child-on-child sexual abuse; sexual exploitation; human trafficking; physical abuse; emotional abuse; neglect; bodily

injury and resulting pain and suffering, deterioration, discomfort, disability, and mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; expenses incurred for mental health care and treatment; activation, aggravation, and/or exacerbation of preexisting conditions; and other reasonably foreseeable compensatory damages. The losses are either permanent or continuing in nature, and T.M. will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, CHILDNET, INC. for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

**COUNT II - CULPABLE NEGLIGENCE CLAIM AGAINST DEFENDANT CHILDNET, INC.**

160. Plaintiff realleges paragraphs 1-155 as if fully set forth herein.

161. Defendant, CHILDNET owed the following statutory duties pursuant to section 409.993, Florida Statutes, to T.M.:

a. To not act in a culpably negligent manner while providing foster care and related services to T.M.;

b. To not act with reckless indifference of human life while providing foster care and related services to T.M.; and

c. To not act with grossly careless disregard of human life while providing foster care and related services to T.M.

162. Defendant, CHILDNET, breached the above statutory duties, and its actions demonstrate that CHILDNET acted with willful and wanton disregard of human rights, safety, and/or property in its provision of foster care and related services to T.M. and/or acted with reckless indifference and/or grossly careless disregard of human life in its provision of foster care and related services to T.M. based upon the following facts:

a. No later than September 20, 2023, CHILDNET knew that it operated a child welfare system of care that was in crisis with insufficient placements to appropriately meet foster children's needs, including T.M., because it had a shortage of foster homes, specialized therapeutic foster homes, therapeutic group homes, and other appropriate placements;

b. No later than September 20, 2023, CHILDNET knew that it operated a child welfare system of care that was dangerous to children with insufficient mental health and behavioral services to meet foster children's needs, including T.M.;

c. CHILDNET had not taken corrective active action to address systemic deficiencies including lack of placements and services and continued to fail to ensure the safety of children as there was still a placement gridlock and crisis throughout 2023 and 2024, resulting in large numbers of children, including T.M. being exposed to the substantial risk of serious harm;

d. Prior to September 2023 and through May 2024, CHILDNET over-utilized the placement of children, including T.M., in dangerous shelters and group homes with knowledge that these children would be exposed to harms including sexual abuse, physical violence, substance use, and deteriorating mental health;

e. CHILDNET failed to ensure T.M. was immediately placed in a STFC home when recommended by professional judgment due to her mental health diagnoses and behaviors, and when it was believed that T.M. needed placement in a RTC/SIPP facility;

f. CHILDNET failed to ensure T.M. was immediately placed in a TGH when recommended by professional judgment due to her mental health diagnoses and behaviors and when such placement was Court ordered;

g. CHILDNET failed to ensure T.M. was immediately placed in a secure RTC/SIPP facility when recommended by professional judgment due to her mental health diagnoses and behaviors and when such placement was Court ordered;

h. CHILDNET failed to ensure T.M. immediately and continuously received intensive individual counseling, a behavior analyst evaluation and services, and a substance abuse evaluation and treatment, despite knowledge that these services had been recommended and were necessary to ensure her safety and prevent her from deteriorating;

i. CHILDNET failed to ensure that Child Placement Agreements were implemented and followed to prevent children identified as sexual abuse victims or who were sexually reactive and/or aggressive from victimizing other children and engaging in child-on-child sexual abuse incidents, including T.M.;

j. CHILDNET continuously failed to ensure that when children returned from runaway status, including T.M., that they were immediately assessed to determine appropriate placement and additional services resulting in harm to children, including T.M.;

k. CHILDNET continuously failed to ensure that T.M. was in a placement that could meet her mental health needs and instead allowed T.M. to be placed in shelters and group homes which were dangerous for her; and

l. CHILDNET deliberately ignored Court Orders, including one requiring one to one supervision of T.M. if she were to be placed at AVIDITY SAFE PLACE, after the court found that this placement was not an appropriate placement for T.M., T.M. was not safe at AVIDITY SAFE PLACE, and T.M. had been traumatized and abused multiple times under CHILDNET's supervision.

163. As a direct result and proximate cause of the aforementioned breaches, T.M. suffered emotional harm; deteriorating mental health; sexual abuse/assault; child-on-child sexual abuse; sexual exploitation; human trafficking; physical abuse; emotional abuse; neglect; bodily injury and resulting pain and suffering, deterioration, discomfort, disability, and mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; expenses incurred for mental health care and treatment; activation, aggravation, and/or exacerbation of preexisting conditions; and other reasonably foreseeable compensatory damages. The losses are either permanent or continuing in nature, and T.M. will suffer the losses in the future.

164. The caps and limitations of § 409.993, Florida Statutes, are inapplicable to T.M.'s damages, which are described in paragraph 163 because of CHILDNET's reckless, willful, wanton, grossly careless, and/or dangerous acts which proximately caused T.M.'s injuries.

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in § 409.993, Florida Statutes, against Defendant, CHILDNET, INC., and all other such relief as the Court may deem just and proper.

**COUNT III - 42 U.S.C. § 1983 CLAIM AGAINST DEFENDANT CHILDNET, INC.**

165. Plaintiff reavers and realleges paragraphs 1 through 155 as if fully set forth herein.


justice for kids

166. This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of guaranteed rights under the Fourteenth Amendment of the United States Constitution.

167. At all times material hereto, CHILDNET was a "person" and was acting under the color of state law within the meaning of 42 U.S.C. § 1983.

168. At all times material hereto, pursuant to § 409.993(1)(a), Florida Statutes, although foster care was a public function traditionally within the exclusive prerogative of the State of Florida, CHILDNET assumed responsibility as a private non-governmental entity.

169. At all times material hereto, it was clearly established that children in the physical custody of the state foster care system, including T.M., had the constitutionally protected right to be safe and free from unreasonable risk of harm and to receive services in accordance with professional judgment.

170. On or before September 2023, CHILDNET established and enforced a custom, policy, or practice that resulted in a placement crisis by failing to have or obtain sufficient placements, including specialized therapeutic foster care placements and therapeutic group home placements, for foster children so that children could be placed in accordance with professional judgment.

171. CHILDNET established and enforced a custom, policy, or practice of over-utilizing shelters and group homes for placement of foster children.

172. CHILDNET established and enforced a custom, policy, or practice on a widespread basis of allowing foster children with known mental, behavioral, medical and emotional problems to be placed in unsecure shelters and group homes, notwithstanding that it was exposing such children to numerous dangers.

173. CHILDNET established and enforced a custom, policy, or practice that failed to ensure that mental health, substance abuse, behavioral needs, and medical needs of foster children in state custody were assessed, evaluated, and treated in accordance with professional judgment.

174. CHILDNET established and enforced a custom, policy, or practice on a widespread basis that failed to require recommendations from CBHAs, psychological evaluations, psychiatric evaluations, mental health evaluations, and Suitability Assessments, to be followed in accordance with professional judgment, thereby exposing children in its care to the substantial risk of serious harm.

175. CHILDNET established and enforced a custom, policy, or practice which did not have adequate foster care placements to meet the placement needs of foster children in foster care because it had a shortage of specialized therapeutic foster homes and therapeutic group homes.

176. CHILDNET established and enforced a custom, policy, or practice of failing to appropriately monitor its subcontracted providers and of deliberately failing to learn of the dangers that children in its custody were exposed to.

177. CHILDNET established and enforced a custom, policy, or practice of allowing foster children with known mental, behavioral, emotional, and substance abuse problems, sexual histories, and violent histories, to be placed in dangerous shelters and group homes, where they could, and did, run away, notwithstanding that it was exposing such children to dangers and the substantial risk of serious harm on the streets including criminal acts, drug use, engaging in risky sexual behaviors, and becoming victims of human trafficking.

178. CHILDNET established and enforced a custom, policy, or practice of failing to appropriately staff cases and assess children to ensure appropriate services, placement, and a plan of care to prevent further runaway episodes and deterioration while in care, including T.M.

179. CHILDNET established and enforced a custom, policy, or practice of failing to ensure Court Orders from the Dependency Court were complied with regarding placement, services, supervision, and monitoring of children in foster care, including T.M.

180. CHILDNET was responsible for, but failed to ensure that children under its care, including T.M., had a complete and accurate plan of care that addressed their needs consistent with their mental health evaluations and their level of care and failed to continually assess and determine any need for service referrals in accordance with professional judgment.

181. At all times material hereto, CHILDNET did not provide services or placements to T.M., who was in the physical and legal custody of CHILDNET, in accordance with professional judgment, and was deliberately indifferent and/or acted with reckless disregard to T.M.'s health, safety, and welfare and Constitutional and federal rights, including, without limitation, utilizing dangerous shelters for children in its care; utilizing dangerous group homes for children in its care; failing to ensure that T.M. was placed in a safe environment that could meet her needs; failing to ensure a sufficient safety plan / Child Placement Agreement was implemented and followed to protect T.M. from sexual abuse while in care and from engaging in sexually reactive behaviors after having been sexually abused while in care; failing to ensure that T.M. received intensive individual counseling as necessary, as recommended, and as Court ordered; failing to ensure that T.M. received a behavior analyst evaluation and services as necessary and recommended; failing to ensure T.M. was placed in a specialized therapeutic foster home when recommended; failing to ensure T.M. was placed in a therapeutic group home when recommended and Court ordered; failing to ensure T.M. was placed in a RTC/SIPP therapeutic group home when recommended and Court ordered; failing to have appropriate and available placements for foster children in Broward and Palm Beach Counties; failing to staff T.M.'s case and determine the need for enhanced services

and change of placement each time T.M. returned from being on runaway; failing to ensure that T.M. received intensive individual therapy as necessary and professionally recommended; failing to ensure that T.M. received trauma therapy as necessary and professionally recommended; failing to ensure T.M. received therapy for being a victim of sexual abuse as necessary; failing to ensure that T.M. received a substance abuse evaluation and treatment as necessary; failing to ensure T.M. was consistently enrolled in school and was in an appropriate educational environment to meet her needs; failing to ensure that T.M. received medical treatment when it was known that she was a victim of physical abuse, sexual abuse, and had engaged in unprotected child-on-child sexual incidents; failing to ensure T.M. was given proper assessments and services to prevent her from running away; failing to ensure Court Orders for supervision of T.M. were complied with; failing to report known and/or suspected incidents of abuse and neglect; failing to monitor its subcontractors to ensure child safety; and by directly exposing T.M. to sexual abuse, physical abuse, emotional abuse and neglect and causing her mental health condition to deteriorate and exposing T.M. to unnecessary risk of harm.

182. CHILDNET established and maintained an unconstitutional system of care that resulted in the widespread harm to foster children, including T.M., because it abdicated its constitutional and statutory duties to ensure that each child in its care was free from harm resulting in a child welfare system that blatantly ignored and/or deliberately failed to learn of the plethora of red flags, dangers and warning signs that T.M.'s needs were not being properly addressed and provided for.

183. CHILDNET violated T.M.'s Constitutional rights and exposed her to a substantial risk of serious harm by:

a. Accepting responsibility for the custody and care of T.M. knowing that T.M. was in immediate need of safe therapeutic placement, but repeatedly authorizing placement in shelters and group homes which were dangerous placements for T.M. that could not protect T.M. from harm and could not meet her needs.

b. Accepting responsibility for the custody and care of T.M. knowing that T.M. was at high risk for danger, elopement and running away, had run away multiple times previously, and that she intended to run away from various placements; yet CHILDNET repeatedly authorized placement of T.M. in unsecure shelters which were dangerous placements for T.M. which could not protect T.M. from harm.

c. Accepting responsibility for the custody and care of T.M. knowing that T.M. was in immediate need of intensive therapeutic, behavioral, mental health, psychiatric, psychological, emotional, and residential services, and eventually substance abuse services, but failing to ensure that she received these immediate services.

d. Accepting responsibility for the custody and care of T.M. and exposing her to substantial risk of serious harm by failing to ensure a sufficient safety plan – Care Precaution Plan was implemented and failing to protect T.M. from sexual abuse and preventing further sexually reactive behaviors once T.M. was the victim of child-on-child sexual abuse / sexual battery / sexual assault while in out-of-home care.

e. Allowing T.M.'s behaviors to escalate and her mental health to significantly deteriorate over the eight (8) months she was in foster care when it exposed her to sexual abuse, physical abuse, emotional abuse, and neglect in foster care

placements and failed to provide her with appropriate therapeutic placements and services to address her emotional needs.

184. CHILDNET was deliberately indifferent to the serious psychiatric and psychological needs of children in its care and custody, including T.M.

185. At all times that CHILDNET was taking the actions described herein, it was clearly established that children in the physical custody of the state foster care system, like T.M., have the Constitutionally and federally protected right to receive mental health services in accordance with professional judgment and not be exposed to deterioration of mental health and emotional harm.

186. Despite possessing the authority and means to remedy the unconstitutional treatment of the child and seek safe therapeutic placement and services to address T.M.'s serious mental health needs, CHILDNET was deliberately indifferent to T.M.'s right to receive treatment for her serious mental health needs by failing to timely address T.M.'s emotional, behavioral, and mental health needs, failing to ensure T.M. received safe, stable, therapeutic placement, and deliberately violating Court orders for safe therapeutic placement for T.M., which subjected T.M. to further psychological harm and deterioration.

187. Despite possessing the authority and means to remedy the unconstitutional treatment of T.M. and seek safe and secure therapeutic placement and services to address T.M.'s serious mental health needs, CHILDNET was deliberately indifferent to T.M.'s right to receive treatment for her serious mental health needs by failing to timely assess her medical, mental health, behavioral, psychological, substance abuse, and emotional needs, failing to timely address her medical, mental health, behavioral, psychological, substance abuse, and emotional needs, failing to ensure T.M. received safe, stable therapeutic placement, and the substantial risk that T.M.'s condition would continue to deteriorate, and CHILDNET knowingly and recklessly disregarded

an excessive risk to her health and safety which subjected T.M. to further psychological harm and deterioration.

188. Despite possessing the authority and means to remedy the unconstitutional treatment of T.M., CHILDNET was deliberately indifferent to T.M.'s medical, mental health, behavioral, psychological, emotional, substance abuse, and educational needs and the substantial risk that T.M.'s condition would continue to deteriorate, and CHILDNET knowingly and recklessly disregarded an excessive risk to her health and safety.

189. At all times material hereto, CHILDNET knew of the dangers and risks of harm to foster children and children in state care, and to T.M. in particular, when on runaway status and/or away from their placement without authorization, including, but not necessarily limited to, physical and sexual assault, rape, pregnancy, sexually transmitted diseases, drug and alcohol use, homelessness, delinquency, prostitution, abduction and kidnapping, domestic violence, human trafficking, murder, suicide, and death (said dangers having been extensively studied, reported upon, and are well known to child welfare professionals throughout the State of Florida and nationwide). Despite this knowledge, in violation of multiple Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, and CHILDNET's Policies and Procedures, CHILDNET failed to ensure T.M. was placed in a safe placement or a secure facility initially, failed to ensure T.M. was placed in a safe placement or a secure facility when she returned from runaway each time, failed to prevent T.M. from eloping and running away, failed to properly handle a runaway child or a child in danger and at risk of eloping, failed to follow Court orders with respect to T.M.'s placement and supervision to prevent elopement, and treated T.M. as a "throwaway child."


justice for kids

190. CHILDNET took said actions described herein knowing it was exposing children who were in State custody, including T.M., to a substantial risk of serious harm.

191. CHILDNET violated T.M.'s fundamental right of physical safety subjecting her to a heightened risk of danger.

192. CHILDNET's actions and failures to act were done with knowledge that said actions would deprive T.M. of her constitutional rights to be free from harm.

193. Despite possessing the authority and means to remedy the unconstitutional treatment of T.M. and to seek and secure treatment and a safe, stable, and secure placement to address T.M.'s serious mental health needs, CHILDNET was deliberately indifferent to the substantial risk that T.M.'s condition would and did continue to deteriorate and knowingly and recklessly disregarded an excessive risk to her health and safety.

194. As a direct and proximate result of CHILDNET's deliberate indifference and/or recklessness, T.M. suffered emotional harm; deteriorating mental health; sexual abuse/assault; child-on-child sexual abuse; sexual exploitation; human trafficking; physical abuse; emotional abuse; neglect; bodily injury and resulting pain and suffering, deterioration, discomfort, disability, and mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; expenses incurred for mental health care and treatment; activation, aggravation, and/or exacerbation of preexisting conditions; and other reasonably foreseeable compensatory damages. The losses are either permanent or continuing in nature, and T.M. will suffer the losses in the future.

195. Plaintiff is obligated to the undersigned firm for payment of attorney's fees and costs, and seeks recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff prays that this Honorable Court enter a judgment in favor of Plaintiff against Defendant, CHILDNET, INC., for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT IV - NEGLIGENCE CLAIM AGAINST DEFENDANT PARTNERSHIP FOR COMMUNITY HEALTH, INC. D/B/A AVIDITY

196. Plaintiff realleges paragraphs 1-155 as if fully set forth herein.

197. Defendant, AVIDITY, as the agency providing "Pre-Placement/Respite" shelter services to foster children in Broward County, owed T.M. the following statutory, contractual, and common law duties:

a. To ensure T.M.'s health, safety and well-being while under its care, custody, and supervision;

b. To protect T.M. from sexual abuse, child-on-child sexual abuse, physical abuse, emotional abuse, neglect, victimization, and further harm;

c. To provide a safe, secure environment where T.M. was free from unreasonable risk of harm;

d. To use reasonable care in the oversight and supervision of T.M.;

e. To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, DCF's Operating Procedures, CHILDNET's Policies and Procedures, AVIDITY's Policies and Procedures, and AVIDITY's contract(s) with CHILDNET, regarding the health, welfare, and safety of T.M.;

f. To ensure that placement in the AVIDITY SAFE PLACE shelter was in T.M.'s best interest pursuant to, and including, but not limited to, F.S. 39.4021, F.S. 39.4022, F.S. 39.4023, F.S. 39.01375, F.A.C. 65C-28.024, F.A.C. 65C-30.011, F.A.C. 65C-29.007, DCF Operating Procedure 170-11, and CHILDNET Policies CN003.038, CN003.051, CN015.017;

g. To deny T.M. admission into the AVIDITY SAFE PLACE shelter based on her special needs and emotional problems that AVIDITY SAFE PLACE could not accommodate, recommendations that T.M. be placed in a higher level of care, and Court orders that T.M. be placed in a higher level of care;

h. To have knowledge of T.M.'s individualized physical, emotional, behavioral, social, and educational needs, as well as her background and history upon admission into AVIDITY SAFE PLACE, and if such information wasn't immediately available, to follow-up with CHILDNET until such information was received;

i. To obtain all available information regarding the foster children placed at AVIDITY SAFE PLACE, including whether the child had a history of sexual abuse, sexual acting out, sexual aggression, violence, and/or substance abuse to enable caregivers to implement all precautionary measures necessary and required to keep all foster children in that placement safe in the placement and outside of that placement, including T.M., pursuant to, and including, but not limited to, F.S. 39.4021, F.S. 39.4022, F.S. 39.4023, F.S. 39.01375, F.A.C. 65C-28.024, F.A.C. 65C-30.011, F.A.C. 65C-29.007, DCF Operating Procedure 170-11, CHILDNET Policies CN003.038, CN003.051, CN015.017, and AVIDITY Policies and Procedures;

j. To continually assess the adequacy and safety of T.M.'s placement at AVIDITY SAFE PLACE and request T.M.'s removal's when AVIDITY SAFE PLACE knew that it could not meet T.M.'s immediate need for safety and protection;

k. To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all foster children, including T.M., were safe, appropriately cared for, and adequately supervised;

l. To ensure safety plans, child placement agreements, and any other necessary safety measures were implemented to ensure T.M. would not engage in self-harm, be a victim of child-on-child sexual abuse, and prevent sexually reactive behaviors pursuant to, and including, but not limited to, F.A.C. 65C-30.011, F.A.C. 65C-29.007, DCF Operating Procedure 170-11, CHILDNET Policies CN003.038, CN003.051, CN015.017, and AVIDITY Policies and Procedures;

m. To ensure all necessary and appropriate assessments and evaluations for T.M. were completed in a timely manner, including, but not limited to, Suitability Assessments, psychological evaluations, psychiatric evaluations, psychosexual evaluations, behavioral assessments, and substance abuse assessments;

n. To ensure that all recommendations from assessors, evaluators, and other professionals regarding T.M. were followed and implemented in a timely manner;

o. To ensure T.M. consistently received necessary and recommended therapeutic services, behavioral services, and educational services in a timely manner;

p. To ensure that all children in AVIDITY SAFE PLACE, including T.M., were safe, appropriately cared for, and adequately supervised;

q. To provide any necessary safety measures to ensure T.M. was adequately supervised;

r. To comply with all Court Orders regarding placement, services, supervision, and monitoring of T.M.;

s. To ensure that T.M. was provided with appropriate education;

t. To ensure that all reasonable suspicion of abuse, including child-on-child sexual abuse, and neglect was reported to the Abuse Hotline;

u. To properly report, investigate and take action on incidents of children in the custody and care of the State of Florida, including T.M., eloping and running away from its physical custody and/or their placements pursuant to, and including, but not limited to, F.S. 39.0141, F.A.C. 65C-30.019, DCF Operating Procedure 170-03, CHILDNET Policy CN013.008, and AVIDITY Policies and Procedures;

v. To implement reasonable safeguards to prevent children in the custody of the State of Florida, including T.M., from eloping and running away, to immediately report all children known to be missing, including T.M., to law enforcement, the Court, and DCF, among others, and to take all reasonable and necessary steps and action to take such children back into physical custody and place them in a safe, secure placement pursuant to, and including, but not limited to, F.S. 39.0141, F.A.C. 65C-30.019, DCF Operating Procedure 170-03, CHILDNET Policy CN013.008, and AVIDITY Policies and Procedures; and

w. To ensure that T.M. was assessed, referred for appropriate services, and placed in a safe placement each and every time she returned from runaway status pursuant to, and including, but not limited to, F.A.C. 65C-30.019, DCF Operating Procedure 170-03, CHILDNET Policy CN013.008, and AVIDITY Policies and Procedures.

198. Defendant, AVIDITY breached said duties.

199. As a direct result and proximate cause of the aforementioned breaches, T.M. suffered emotional harm; deteriorating mental health; sexual abuse/assault; child-on-child sexual


justice for kids

abuse; sexual exploitation; human trafficking; physical abuse; emotional abuse; neglect; bodily injury and resulting pain and suffering, deterioration, discomfort, disability, and mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; expenses incurred for mental health care and treatment; activation, aggravation, and/or exacerbation of preexisting conditions; and other reasonably foreseeable compensatory damages. The losses are either permanent or continuing in nature, and T.M. will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, PARTNERSHIP FOR COMMUNITY HEALTH, INC., D/B/A AVIDITY for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

**COUNT V – CULPABLE NEGLIGENCE CLAIM AGAINST DEFENDANT PARTNERSHIP FOR COMMUNITY HEALTH, INC. D/B/A AVIDITY**

200. Plaintiff realleges paragraphs 1-155 as if fully set forth herein.

201. Defendant, AVIDITY, owed the following statutory duties pursuant to section 409.993, Florida Statutes, to T.M.:

a. To not act in a culpably negligent manner while providing foster care and related services to T.M.;

b. To not act with reckless indifference of human life while providing foster care and related services to T.M.; and

c. To not act with grossly careless disregard of human life while providing foster care and related services to T.M.

202. Defendant, AVIDITY, breached the above statutory duties, and its actions demonstrate that AVIDITY acted with willful and wanton disregard of human rights, safety, and/or property in its provision of foster care and related services to T.M. and/or acted with reckless


justice for kids

indifference and/or grossly careless disregard of human life in its provision of foster care and related services to T.M. based upon the following facts:

a. Prior to September 2023 and through May 2024, AVIDITY accepted placement of hard to place children who needed a higher level, and who were often Court ordered into a higher level of care, in its SAFE PLACE "Pre-placement/respite" program, including T.M., with knowledge that these children would be exposed to harms including sexual abuse, physical violence, substance use, and deteriorating mental health;

b. AVIDITY accepted placement of T.M. despite knowledge that placement in a STFC home was recommended by professional judgment, and it was believed that T.M. needed placement in a secure RTC/SIPP facility, due to her mental health diagnoses and behaviors;

c. AVIDITY accepted placement of T.M. despite knowledge that placement in a TGH was recommended by professional judgment and was Court ordered due to her mental health diagnoses and behaviors;

d. AVIDITY accepted placement of T.M. despite knowledge that placement in a secure RTC/SIPP facility was recommended by professional judgment and was Court ordered due to her mental health diagnoses and behaviors;

e. AVIDITY failed to ensure T.M. immediately and continuously received intensive individual counseling, a behavior analyst evaluation and services, a substance abuse evaluation and treatment, and educational services despite knowledge that these services had been recommended and were necessary to ensure her safety and prevent her from deteriorating;


justice for kids

f. AVIDITY failed to ensure that Child Placement Agreements were implemented and followed to prevent children identified as sexual abuse victims or who were sexually reactive and/or aggressive from victimizing other children and engaging in child-on-child sexual abuse incidents, including T.M.; and

g. AVIDITY continuously failed to ensure that when children returned from runaway status, including T.M., that they were immediately assessed to determine appropriate placement and additional services, resulting in harm to children, including T.M.;

h. AVIDITY continuously failed to ensure that T.M. was removed from AVIDITY SAFE PLACE and placed in a placement that could meet her mental health needs and instead allowed T.M. to be remain placed at AVIDITY SAFE PLACE which was dangerous for her; and

i. AVIDITY deliberately ignored Court Orders, including one requiring one to one supervision of T.M. if she were to be placed at AVIDITY SAFE PLACE, after the court found that this placement was not an appropriate placement for T.M., T.M. was not safe at AVIDITY SAFE PLACE, and T.M. had been traumatized and abused multiple times under AVIDITY's supervision.

203. As a direct result and proximate cause of the aforementioned breaches, T.M. suffered emotional harm; deteriorating mental health; sexual abuse/assault; child-on-child sexual abuse; sexual exploitation; human trafficking; physical abuse; emotional abuse; neglect; bodily injury and resulting pain and suffering, deterioration, discomfort, disability, and mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; expenses incurred for mental health care and treatment; activation, aggravation, and/or

exacerbation of preexisting conditions; and other reasonably foreseeable compensatory damages. The losses are either permanent or continuing in nature, and T.M. will suffer the losses in the future.

204. The caps and limitations of § 409.993, Florida Statutes, are inapplicable to T.M.'s damages, which are described in paragraph 203 because of AVIDITY's reckless, willful, wanton, grossly careless, and/or dangerous acts which proximately caused T.M.'s injuries.

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in § 409.993, Florida Statutes, against Defendant, PARTNERSHIP FOR COMMUNITY HEALTH, INC., D/B/A AVIDITY, and all other such relief as the Court may deem just and proper.

**COUNT VI - NEGLIGENCE CLAIM AGAINST DEFENDANT LUTHERAN SERVICES FLORIDA, INC.**

205. Plaintiff realleges paragraphs 1-155 as if fully set forth herein.

206. Defendant, LSF, as the agency providing "Pre-Placement/Respite" shelter services to foster children in Palm Beach County, owed T.M. the following statutory, contractual, and common law duties:

a. To ensure T.M.'s health, safety and well-being while under its care, custody, and supervision;

b. To protect T.M. from sexual abuse, child-on-child sexual abuse, physical abuse, emotional abuse, neglect, victimization, and further harm;

c. To provide a safe, secure environment where T.M. was free from unreasonable risk of harm;

d. To use reasonable care in the oversight and supervision of T.M.;

e. To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, DCF's Operating Procedures, CHILDNET's Policies and Procedures, LSF's Policies and Procedures, and LSF's contract(s) with CHILDNET, regarding the health, welfare, and safety of T.M.;


justice for kids

f. To ensure that placement in the LSF SAFE PLACE shelter was in T.M.'s best interest pursuant to, and including, but not limited to, F.S. 39.4021, F.S. 39.4022, F.S. 39.4023, F.S. 39.01375, F.A.C. 65C-28.024, F.A.C. 65C-30.011, F.A.C. 65C-29.007, DCF Operating Procedure 170-11, and CHILDNET Policies CN003.038, CN003.051, CN015.017;

g. To deny T.M. admission into the LSF SAFE PLACE shelter based on her special needs and emotional problems that LSF SAFE PLACE could not accommodate, recommendations that T.M. be placed in a higher level of care, and Court orders that T.M. be placed in a higher level of care;

h. To have knowledge of T.M.'s individualized physical, emotional, behavioral, social, and educational needs, as well as her background and history upon admission into LSF SAFE PLACE, and if such information wasn't immediately available, to follow-up with CHILDNET until such information was received;

i. To ensure that all available was obtained regarding the foster children placed at LSF SAFE PLACE, including whether the child had a history of sexual abuse, sexual acting out, sexual aggression, violence, and/or substance abuse to enable caregivers to implement all precautionary measures necessary and required to keep all foster children in that placement safe in the placement and outside of that placement, including T.M., pursuant to, and including, but not limited to, F.S. 39.4021, F.S. 39.4022, F.S. 39.4023, F.S. 39.01375, F.A.C. 65C-28.024, F.A.C. 65C-30.011, F.A.C. 65C-29.007, DCF Operating Procedure 170-11, CHILDNET Policies CN003.038, CN003.051, CN015.017, and LSF Policies and Procedures;

j. To continually assess the adequacy and safety of T.M.'s placement at LSF SAFE PLACE and request T.M.'s removal when LSF SAFE PLACE knew that it could not meet T.M.'s immediate need for safety and protection;

k. To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all foster children, including T.M. were safe, appropriately cared for, and adequately supervised;

l. To ensure safety plans, child placement agreements, and any other necessary safety measures were implemented to ensure T.M. would not engage in self-harm, be a victim of child-on-child sexual abuse, and prevent sexually reactive behaviors pursuant to, and including, but not limited to, F.A.C. 65C-30.011, F.A.C. 65C-29.007, DCF Operating Procedure 170-11, CHILDNET Policies CN003.038, CN003.051, CN015.017, and LSF Policies and Procedures;

m. To ensure all necessary and appropriate assessments and evaluations for T.M. were completed in a timely manner, including, but not limited to, Suitability Assessments, psychological evaluations, psychiatric evaluations, psychosexual evaluations, behavioral assessments, and substance abuse assessments;

n. To ensure that all recommendations from assessors, evaluators, and other professionals regarding T.M. were followed and implemented in a timely manner;

o. To ensure T.M. consistently received necessary and recommended therapeutic services, behavioral services, and educational services in a timely manner;

p. To ensure that all children in LSF SAFE PLACE, including T.M., were safe, appropriately cared for, and adequately supervised;

q. To provide any necessary safety measures to ensure T.M. was adequately supervised;

r. To comply with all Court Orders regarding placement, services, supervision, and monitoring of T.M.;

s. To ensure that T.M. was provided with appropriate education;

t. To ensure that all reasonable suspicion of abuse, including child-on-child sexual abuse, and neglect was reported to the Abuse Hotline;

u. To properly report, investigate and take action on incidents of children in the custody and care of the State of Florida, including T.M., eloping and running away from its physical custody and/or their placements pursuant to, and including, but not limited to, F.S. 39.0141, F.A.C. 65C-30.019, DCF Operating Procedure 170-03, CHILDNET Policy CN013.008, and LSF Policies and Procedures;

v. To implement reasonable safeguards to prevent children in the custody of the State of Florida, including T.M., from eloping and running away, to immediately report all children known to be missing, including T.M., to law enforcement, the Court, and DCF, among others, and to take all reasonable and necessary steps and action to take such children back into physical custody and place them in a safe, secure placement pursuant to, and including, but not limited to, F.S. 39.0141, F.A.C. 65C-30.019, DCF Operating Procedure 170-03, CHILDNET Policy CN013.008, and LSF Policies and Procedures; and

w. To ensure that T.M. was assessed, referred for appropriate services, and placed in a safe placement each and every time she returned from runaway status pursuant to, and including, but not limited to, F.A.C. 65C-30.019, DCF Operating Procedure 170-03, CHILDNET Policy CN013.008, and LSF Policies and Procedures.

207. Defendant, LSF breached said duties.

208. As a direct result and proximate cause of the aforementioned breaches, T.M. suffered emotional harm; deteriorating mental health; sexual abuse/assault; child-on-child sexual abuse; sexual exploitation; human trafficking; physical abuse; emotional abuse; neglect; bodily injury and resulting pain and suffering, deterioration, discomfort, disability, and mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; expenses incurred for mental health care and treatment; activation, aggravation, and/or exacerbation of preexisting conditions; and other reasonably foreseeable compensatory damages. The losses are either permanent or continuing in nature, and T.M. will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, LUTHERAN SERVICES FLORIDA, INC., for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

**COUNT VII – CULPABLE NEGLIGENCE CLAIM AGAINST DEFENDANT LUTHERAN SERVICES FLORIDA, INC.**

209. Plaintiff realleges paragraphs 1-155 as if fully set forth herein.

210. Defendant, LSF, owed the following statutory duties pursuant to section 409.993, Florida Statutes, to T.M.:

a. To not act in a culpably negligent manner while providing foster care and related services to T.M.;

b. To not act with reckless indifference of human life while providing foster care and related services to T.M.; and

c. To not act with grossly careless disregard of human life while providing foster care and related services to T.M.

211. Defendant, LSF, breached the above statutory duties, and its actions demonstrate that LSF acted with willful and wanton disregard of human rights, safety, and/or property in its provision of foster care and related services to T.M. and/or acted with reckless indifference and/or grossly careless disregard of human life in its provision of foster care and related services to T.M. based upon the following facts:

a. Prior to September 2023 and through November 2023, LSF accepted placement of hard to place children who needed a higher level, and who were often Court ordered into a higher level of care, in its SAFE PLACE "Pre-placement/respite" program, including T.M., with knowledge that these children would be exposed to harms including sexual abuse, physical violence, substance use, and deteriorating mental health;

b. LSF accepted placement of T.M. despite knowledge that placement in a STFC home was recommended by professional judgment, and it was believed that T.M. needed placement in a secure RTC/SIPP facility, due to her mental health diagnoses and behaviors;

c. LSF accepted placement of T.M. despite knowledge that placement in a TGH was recommended by professional judgment and was Court ordered due to her mental health diagnoses and behaviors;

d. LSF failed to ensure T.M. immediately and continuously received intensive individual counseling, a behavior analyst evaluation and services, a substance abuse evaluation and treatment, and educational services despite knowledge that these


justice for kids

services had been recommended and were necessary to ensure her safety and prevent her from deteriorating;

e. LSF failed to ensure that Child Placement Agreements were implemented and followed to prevent children identified as sexual abuse victims or who were sexually reactive and/or aggressive from victimizing other children and engaging in child-on-child sexual abuse incidents, including T.M.;

f. LSF continuously failed to ensure that when children returned from runaway status, including T.M., that they were immediately assessed to determine appropriate placement and additional services resulting in harm to children, including T.M.;

g. LSF continuously failed to ensure that T.M. was removed from LSF SAFE PLACE and placed in a placement that could meet her mental health needs and instead allowed T.M. to be remain placed at LSF SAFE PLACE which was dangerous for her; and

h. LSF deliberately ignored Court Orders, including one requiring that T.M. be placed in a TGH to meet her needs.

212. As a direct result and proximate cause of the aforementioned breaches, T.M. suffered emotional harm; deteriorating mental health; sexual abuse/assault; child-on-child sexual abuse; sexual exploitation; human trafficking; physical abuse; emotional abuse; neglect; bodily injury and resulting pain and suffering, deterioration, discomfort, disability, and mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; expenses incurred for mental health care and treatment; activation, aggravation, and/or exacerbation of preexisting conditions; and other reasonably foreseeable compensatory damages.

The losses are either permanent or continuing in nature, and T.M. will suffer the losses in the future.

213. The caps and limitations of § 409.993, Florida Statutes, are inapplicable to T.M.'s damages, which are described in paragraph 212 because of LSF's reckless, willful, wanton, grossly careless, and/or dangerous acts which proximately caused T.M.'s injuries.

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in § 409.993, Florida Statutes, against Defendant, LUTHERAN SERVICES FLORIDA, INC., and all other such relief as the Court may deem just and proper.

**COUNT VIII - NEGLIGENCE CLAIM AGAINST DEFENDANT THE CHILDREN'S PLACE AT HOME SAFE, INC. D/B/A HOMESAFE**

214. Plaintiff realleges paragraphs 1-155 as if fully set forth herein.

215. Defendant, HOME SAFE, as the agency providing "Therapeutic Group Home" services to foster children in Palm Beach County, owed T.M. the following statutory, contractual, and common law duties:

a. To ensure T.M.'s health, safety and well-being while under its care, custody, and supervision;

b. To protect T.M. from sexual abuse, child-on-child sexual abuse, physical abuse, emotional abuse, neglect, victimization, and further harm;

c. To provide a safe, secure environment where T.M. was free from unreasonable risk of harm;

d. To use reasonable care in the oversight and supervision of T.M.;

e. To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, DCF's Operating Procedures, CHILDNET's Policies and Procedures, HOME SAFE's Policies and Procedures, and HOME SAFE's contract(s) with CHILDNET, regarding the health, welfare, and safety of T.M.;

f. To ensure that placement in the HOME SAFE LIBRA HOUSE was in T.M.'s best interest pursuant to, and including, but not limited to, F.S.


justice for kids

39.4021, F.S. 39.4022, F.S. 39.4023, F.S. 39.01375, F.A.C. 65C-28.024, F.A.C. 65C-30.011, F.A.C. 65C-29.007, DCF Operating Procedure 170-11, and CHILDNET Policies CN003.038, CN003.051, CN015.017;

g. To deny T.M. admission into the HOME SAFE LIBRA HOUSE based on her special needs and emotional problems that HOME SAFE LIBRA HOUSE could not accommodate, and when HOME SAFE knew that T.M. was a year younger than the youngest child that HOME SAFE normally accepted into HOME SAFE LIBRA HOUSE;

h. To have knowledge of T.M.'s individualized physical, emotional, behavioral, social, and educational needs, as well as her background and history upon admission into HOME SAFE LIBRA HOUSE, and if such information wasn't immediately available, to follow-up with CHILDNET until such information was received;

i. To obtain all available information regarding the foster children placed at HOME SAFE LIBRA HOUSE, including whether the child had a history of sexual abuse, sexual acting out, sexual aggression, violence, and/or substance abuse to enable caregivers to implement all precautionary measures necessary and required to keep all foster children in that placement safe in the placement and outside of that placement, including T.M., pursuant to, and including, but not limited to, F.S. 39.4021, F.S. 39.4022, F.S. 39.4023, F.S. 39.01375, F.A.C. 65C-28.024, F.A.C. 65C-30.011, F.A.C. 65C-29.007, DCF Operating Procedure 170-11, CHILDNET Policies CN003.038, CN003.051, CN015.017, and HOME SAFE Policies and Procedures;

j. To continually assess the adequacy and safety of T.M.'s placement at HOME SAFE LIBRA HOUSE and request T.M.'s removal when HOME SAFE LIBRA HOUSE knew that it could not meet T.M.'s immediate need for safety and protection, when HOME SAFE recommended that T.M. be placed in a higher level of care, and when a Qualified Assessor recommended that T.M. be placed in a higher level of care;

k. To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all foster children, including T.M. were safe, appropriately cared for, and adequately supervised;

l. To ensure safety plans, child placement agreements, and any other necessary safety measures were implemented to ensure T.M. would not engage in self-harm, be a victim of child-on-child sexual abuse, and prevent sexually reactive behaviors pursuant to, and including, but not limited to, F.A.C. 65C-30.011; F.A.C. 65C-29.007, DCF Operating Procedure 170-11, CHILDNET Policies CN003.038, CN003.051, CN015.017, and HOME SAFE Policies and Procedures;

m. To ensure all necessary and appropriate assessments and evaluations for T.M. were completed in a timely manner, including, but not limited to, Suitability Assessments, psychological evaluations, psychiatric evaluations, psychosexual evaluations, behavioral assessments, and substance abuse assessments;

n. To ensure that all recommendations from assessors, evaluators, and other professionals regarding T.M. were followed and implemented in a timely manner;

o. To ensure T.M. consistently received necessary and recommended therapeutic services, behavioral services, and educational services in a timely manner;

p. To ensure that all children in HOME SAFE LIBRA HOUSE, including T.M., were safe, appropriately cared for, and adequately supervised;

q. To provide any necessary safety measures to ensure T.M. was adequately supervised;

r. To comply with all Court Orders regarding placement, services, supervision, and monitoring of T.M.;

s. To ensure that T.M. was provided with appropriate education;

t. To ensure that all reasonable suspicion of abuse, including child-on-child sexual abuse, and neglect was reported to the Abuse Hotline;

u. To properly report, investigate and take action on incidents of children in the custody and care of the State of Florida, including T.M., eloping and running away from its physical custody and/or their placements pursuant to, and including, but not limited to, F.S. 39.0141, F.A.C. 65C-30.019, DCF Operating Procedure 170-03, CHILDNET Policy CN013.008, and HOME SAFE Policies and Procedures;

v. To implement reasonable safeguards to prevent children in the custody of the State of Florida, including T.M., from eloping and running away, to immediately report all children known to be missing, including T.M., to law enforcement, the Court, and DCF, among others, and to take all reasonable and necessary steps and action to take such children back into physical custody and place them in a safe, secure placement pursuant to, and including, but not limited to, F.S. 39.0141, F.A.C. 65C-30.019, DCF Operating Procedure 170-03, CHILDNET Policy CN013.008, and HOME SAFE Policies and Procedures; and

w. To ensure that T.M. was assessed, referred for appropriate services, and placed in a safe placement each and every time she returned from runaway status pursuant to, and including, but not limited to, F.A.C. 65C-30.019, DCF Operating Procedure 170-03, CHILDNET Policy CN013.008, and HOME SAFE Policies and Procedures.

216. Defendant, HOME SAFE breached said duties.

217. As a direct result and proximate cause of the aforementioned breaches, T.M. suffered emotional harm; deteriorating mental health; sexual abuse/assault; child-on-child sexual abuse; sexual exploitation; human trafficking; physical abuse; emotional abuse; neglect; bodily injury and resulting pain and suffering, deterioration, discomfort, disability, and mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; expenses incurred for mental health care and treatment; activation, aggravation, and/or exacerbation of preexisting conditions; and other reasonably foreseeable compensatory damages. The losses are either permanent or continuing in nature, and T.M. will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, THE CHILDREN'S PLACE AT HOME SAFE, INC., D/B/A HOMESAFE, for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

**COUNT IX – CULPABLE NEGLIGENCE CLAIM AGAINST DEFENDANT THE CHILDREN'S PLACE AT HOME SAFE, INC. D/B/A HOMESAFE**

218. Plaintiff realleges paragraphs 1-155 as if fully set forth herein.

219. Defendant, HOME SAFE, owed the following statutory duties pursuant to section 409.993, Florida Statutes, to T.M.:

a. To not act in a culpably negligent manner while providing foster care and related services to T.M.;

b. To not act with reckless indifference of human life while providing foster care and related services to T.M.; and

c. To not act with grossly careless disregard of human life while providing foster care and related services to T.M.

220. Defendant, HOME SAFE, breached the above statutory duties, and its actions demonstrate that HOME SAFE acted with willful and wanton disregard of human rights, safety, and/or property in its provision of foster care and related services to T.M. and/or acted with reckless indifference and/or grossly careless disregard of human life in its provision of foster care and related services to T.M. based upon the following facts:

a. Prior to November 2023 and through May 2024, HOME SAFE accepted placement of children with significant mental health histories, who needed a higher level, and who were often Court ordered into a higher level of care, in its therapeutic group home, with knowledge that these children would be exposed to harms including sexual abuse, physical violence, substance use, and deteriorating mental health;

b. HOME SAFE accepted placement of T.M. despite knowledge that it was believed that T.M. needed placement in a secure RTC/SIPP facility, due to her mental health diagnoses and behaviors;

c. HOME SAFE failed to ensure T.M. immediately and continuously received intensive individual counseling, a behavior analyst evaluation and services, a substance abuse evaluation and treatment, and educational services despite knowledge that these services had been recommended and were necessary to ensure her safety and prevent her from deteriorating;

d. HOME SAFE failed to ensure that Child Placement Agreements were implemented and followed to prevent children who had known histories of self-harm and/or were identified as sexual abuse victims or who were sexually reactive and/or aggressive


justice for kids

from harming themselves, victimizing other children and engaging in child-on-child sexual abuse incidents, including T.M.;

e. HOME SAFE continuously failed to ensure that when children returned from runaway status, including T.M., that they were immediately assessed to determine appropriate placement and additional services resulting in harm to children, including T.M.;

f. HOME SAFE continuously failed to ensure that T.M. was removed from HOME SAFE LIBRA HOUSE and placed in a secure placement that could meet her mental health needs and instead allowed T.M. to be remain placed at HOME SAFE LIBRA HOUSE which was dangerous for her; and

g. HOME SAFE LIBRA HOUSE deliberately changed T.M.'s psychotropic medication without parental consent and/or a Court order, failed to inform T.M.'s treatment team of critical information regarding T.M.'s safety and well-being, withheld visitation for T.M. with her Guardian ad Litem and family as a form of discipline, and sat by as T.M. "rapidly deteriorated" in its alleged therapeutic placement resulting in T.M. having a substance abuse problem, getting suspended from school, getting expelled from school, getting Baker Acted, and getting arrested twice while placed at HOME SAFE LIBRA HOUSE.

221. As a direct result and proximate cause of the aforementioned breaches, T.M. suffered emotional harm; deteriorating mental health; sexual abuse/assault; child-on-child sexual abuse; sexual exploitation; human trafficking; physical abuse; emotional abuse; neglect; bodily injury and resulting pain and suffering, deterioration, discomfort, disability, and mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment;

expenses incurred for mental health care and treatment; activation, aggravation, and/or exacerbation of preexisting conditions; and other reasonably foreseeable compensatory damages. The losses are either permanent or continuing in nature, and T.M. will suffer the losses in the future.

222. The caps and limitations of § 409.993, Florida Statutes, are inapplicable to T.M.'s damages, which are described in paragraph 221 because of HOME SAFE's reckless, willful, wanton, grossly careless, and/or dangerous acts which proximately caused T.M.'s injuries.

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in § 409.993, Florida Statutes, against Defendant, THE CHILDREN'S PLACE AT HOME SAFE, INC., D/B/A HOMESAFE, and all other such relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all issues so triable in this case.

Dated this 25th day of September, 2025.

Respectfully submitted,

**JUSTICE FOR KIDS ®**
a division of KELLEY KRONENBERG
*Counsel for Plaintiff*
10360 W State Road 84
Ft. Lauderdale, Florida 33324
Telephone: (754) 888-KIDS
Facsimile: (954) 644-4848

*/s/ Stacie J. Schmerling*
STACIE J. SCHMERLING
Florida Bar No. 0083862
LELIA M. SCHLEIER
Florida Bar No. 107019
stacie@justiceforkids.com
lelia@justiceforkids.com
erica@justiceforkids.com